

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-20-1995

# West v Phila Electric

Precedential or Non-Precedential:

Docket 93-1647

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"West v Phila Electric" (1995). *1995 Decisions.* Paper 15.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/15

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 93-1647


JAMES WEST,

                              Appellant.

                    v.

    PHILADELPHIA ELECTRIC COMPANY


        On Appeal From the United States District Court
          For the Eastern District of Pennsylvania
             (D.C. Civil Action No. 91-05863)


              Argued: March 10, 1994

        Before: GREENBERG, ROTH and ROSENN, Circuit Judges

            (Opinion Filed January 19, 1995)

Richard J. Silverberg, Esquire
Jane H. Lovitch, Esquire (Argued)
Richard J. Silverberg & Associates
1717 Arch Street
3700 Bell Atlantic Tower
Philadelphia, PA 19103
        Attorneys for Appellant

David S. Fortney, Esquire
Carolyn P. Short, Esquire (Argued)
Christine L. Ciarrocchi, Esquire
Reed, Smith, Shaw & McClay
1650 Market Street
2500 One Liberty Place
Philadelphia, PA 19103-7301
        Attorneys for Appellee

OPINION OF THE COURT

ROTH, Circuit Judge:

Plaintiff James West appeals from a jury verdict in favor of the defendant, Philadelphia Electric Company ("PECO"), in this action in which he alleges racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2002(e)-(2)(a)(1), and the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 955(a). West's action is based on his claims of a racially hostile work environment at PECO. To prove these claims, West attempted to introduce evidence of incidents, and of PECO's notice of the occurrence of these incidents, dating back to 1986. West contends that all of this evidence was admissible under the theory that the violations were continuing. The rulings of the district court, which West challenges on appeal, require us to address the scope of continuing violations theory when a plaintiff charges the existence of a racially hostile work environment.

At trial, West sought to introduce evidence of acts occurring both prior to and during the 300-day period preceding the filing of his administrative complaint. Despite West's claim

that the alleged hostile work environment constituted a continuing violation of Title VII, the district court determined that it would look to the 300-day period in ruling on the admissibility of much of the evidence proffered by the plaintiff. In making its determinations, the district court excluded evidence preceding the 300-day period unless the evidence involved either the same actor or the same particular form of discriminatory conduct.

We conclude, in this hostile work environment context, that the scope of the admissibility of evidence of events, which preceded the 300-day period, must be grounded in the substantive law at issue. The statutory limitations period is not, therefore, necessarily a bar to the admissibility of pre-statute acts which bear on the work environment and on the employer's awareness of that environment. For the reasons stated below, we find that the district court here was overly restrictive in its determinations of admissibility and that the challenged evidentiary exclusions were erroneous in that they deprived West of the opportunity to present his full case to the jury. We will, therefore, vacate the judgment and remand the case to the district court for a new trial.

I.

A.

Plaintiff James West has worked for defendant PECO since 1972. In 1986, West transferred to PECO's King of Prussia meter repair facility, where he continues to work. West alleges that since 1986, and continuing at least until the time of trial, he and other African-Americans at the meter repair facility encountered a continuous pattern of racial harassment. On November 23, 1990, West filed administrative charges of racial discrimination against PECO with the Equal Employment Opportunity Commission ("EEOC"). Subsequently, on September 17, 1991, he filed this complaint in the Eastern District of Pennsylvania. The complaint alleged that PECO knowingly permitted a hostile work environment to exist for African-American workers at the meter repair shop in violation of Title VII and the Pennsylvania Human Relations Act.[1] In addition, the complaint alleged that PECO unlawfully retaliated against West in the terms and conditions of his employment after he filed the administrative charges.[2]

B.

---

[1] In particular, West made allegations, and evidence was admitted at trial, concerning racially harassing conversations, racially derogatory postings on a bulletin board, slurs and physical threats, a large noose hanging in the workshop entranceway, a picture of a Ku Klux Klan member posted in several locations throughout the workplace, and a Confederate flag painted on the side of a co-worker's helmet. Other evidence, excluded at trial, is discussed below.

[2] The basis of this claim was PECO's temporary transfer of West to another work location in 1991.

Just prior to trial, PECO filed a motion in limine to exclude certain evidence.  PECO argued that West should be precluded from presenting evidence pre-dating the period 300 days before the filing of his administrative complaint.  PECO asserted that this evidence was time-barred by the limitations period established in Title VII.  In PECO's view, the statutory filing period rendered evidence of earlier acts inadmissible as a matter of law.  West, on the other hand, maintained that the alleged hostile work environment was a continuing violation.  He asserted that, because he filed within 300 days of a recent occurrence, he had satisfied the statutory requirement under the theory of a continuing violation.  As such, West countered, neither his claim for recovery nor the evidence relevant to its proof should be limited by the filing period.

At a pretrial conference on PECO's motion, the district court held that West could establish a continuing violation, so that evidence of pre-300-day conduct would be admissible, only if West could establish that the same actors had engaged in prohibited conduct both before and during the 300 day filing period:

> In this trial, you should plan to organize
> your evidence as to the 300-day period, and
> then you'd have to show as to something prior
> to that time, that the same actor was
> involved.  So if there was a different actor,
> there would not be a continuing violation.

Pretrial Conference, May 21, 1993, transcript at 10; Plaintiff's Appendix ("App.") at 44.  Plaintiff's counsel objected, arguing

that, under a hostile work environment claim, liability rests with the employer for failing to remedy a hostile environment as a whole, without regard to individual workers or harassers. As such, the relevant "actor" is the employer; actions of individual employees are relevant as they contribute to the overall hostile environment. The court rejected this approach, stating:

> [T]he way I want you to present the case is, what happened to him to cause him to file the charge and where he was 300 days prior to that time. Plus anything else that's connected . . . through common personnel.

App. at 46. The court followed its rulings with an order entered on May 26, 1993.[3]

At trial, the district court relied upon this ruling to exclude a substantial amount of evidence. Although the record before us is not fully adequate, the individual pieces of evidence, and rulings on them, will be discussed in turn as much as the record permits:

1. Ku Klux Klan Christmas Card.

In November 1989, a white co-worker, Robert Cole, presented West with a picture of a Ku Klux Klan member, dressed in white robe and hood. The picture, which bore a strong resemblance to its presenter, was "folded in Christmas card

---

[3] The order reads, in part, as follows: "[E]vidence pertaining to the following shall be excluded from trial: . . . evidence of alleged racially discriminatory treatment of West by PECO prior to January 26, 1990, except as may be deemed relevant at trial." The court arrived at the January date by counting back 300 days from West's November 23, 1990 filing with the EEOC.

fashion" and inscribed with the words "To Jim." Though West informed the co-worker that this offended him, the picture was later photocopied, distributed to other workers, and posted in the workplace. West offered this incident not only to support his claim of pervasive, continuous racial harassment but also to shed light on another incident involving the same worker posting the same picture throughout the workplace in the summer of 1990.[4] West suggests that the first incident, and his reaction, would have helped to establish discriminatory intent with regard to the later incident.

Though the court initially permitted direct examination of West concerning the November 1989 card, it later ruled that the incident was time-barred because it occurred prior to the 300-day filing period. App. at 99-101, 133.

2.    References to Frank Rizzo.

At trial, the district court permitted West to testify about a picture of former Philadelphia Police Commissioner Frank

---

[4]    The trial court admitted evidence of these later Klan picture postings because they occurred within the 300-day period. Specifically, one of West's African-American co-workers, Ronald Price, testified that Robert Cole approached him with the picture early in the summer of 1990 and asked Price whether he thought the picture was funny. Though Price did not, the following day the picture appeared posted on the door of that worker's storeroom office, on the gas shop bulletin board, and on a bulletin board outside the men's room in the electric shop. It remained posted until sometime in August 1990. App. at 68-72. West also testified that he had seen the postings throughout the summer. App. at 99, 101.

Rizzo that was posted in the workplace in 1987 or 1988.[5]  West stated that he found the picture to be racially offensive. Defendant's App. at 161.  However, the court excluded West's testimony about several incidents between himself and a white foreman, Howard Wiese, that could have explained to the jury why West found the picture to be offensive.  West alleges that on several occasions, in 1987 and 1988, Wiese approached him and slammed a stick on West's workbench, remarking, "This is how Rizzo kept 'city people' in line when he was Police Commissioner."  App. at 137.  West also claims that references to "city people" were commonly understood in the shop to refer to African-Americans.  Id.  Because the Wiese incidents occurred before the 300-day period and because Wiese had retired and "engaged in no conduct in 1990 or thereafter," this evidence was excluded.  Id. at 137-38.

3.   Pre-300 Day Racial Comments.

At trial, the court excluded testimony by both West and an African-American co-worker, Ronald Price, concerning racially hostile comments and conversations that occurred prior to the 300-day period.  For example, when West's counsel attempted to

_____

[5]   This was consistent with the court's general rulings on allegedly racially offensive postings in the workplace, as the court permitted evidence on such postings dating back to 1986. App. at 115.  The court's rationale for allowing the evidence of racially derogatory postings prior to the 300-day period was that this was a particular form of racial harassment that was pervasive and regular, so that a continuous violation could be shown with regard to the postings in particular.  App. at 115, 135.

question him regarding hostile conversations with a white foreman, William Esbiornson, dating back to 1986, the court precluded the testimony on the grounds that the conversations occurred prior to 1990 and West had not established that the verbal harassment by this particular worker was, in itself, pervasive and regular:

> You haven't established yet, Counsel, that he had daily contact with this person, Esbiornson, such that the contact could be said, assuming the subject was racially offensive, to have been pervasive and regular so as to go back beyond 1990 in terms of contact.

App. at 166-67.

The court excluded the testimony of Ronald Price about racially hostile conversations he had experienced prior to 1990. App. at 79-85. The court warned counsel, with regard to his questioning of the witness: "Make it, sir, during 1990. . . [I]f you wish to ask him any questions, follow my directions or withdraw him as a witness." App. at 82. Plaintiff's counsel objected, reiterating that it was plaintiff's theory that the alleged hostile work environment was a continuing violation, existing both during and prior to 1990. The court, however, indicated that for a continuing violation to exist, so that pre-1990 evidence could be considered admissible, it was necessary to establish first that there was day-to-day harassment by the particular worker at issue. App. at 85.

       4.   Pre-300 Day Notice to Management.

The court also excluded evidence, from the pre-300 day period, that had a bearing upon whether PECO's management knew or should have known of the alleged hostile work environment. For example, the plaintiff called as a witness William Barrett, the superintendent of the meter shop from July 1988 to December 1989. The court sustained an objection to any questioning about the pre-1990 period, particularly whether Barrett concluded that a race relations problem existed at the meter shop during that time. In addition, although the plaintiff had copies of Barrett's notes discussing a racial incident at the shop in January 1989, the court excluded any testimony about either the notes or the incident. App. at 122-26.

West also attempted to demonstrate PECO's actual notice of the hostile work environment through the testimony of Ronald Price. Price was prepared to testify that he had complained to management about the hostile work environment on a number of occasions. The court excluded the testimony, explaining: "300 days prior to the filing of the complaint, that's the ruling." App. at 96.

5. <u>Pre-300 Day Harassment Not Witnessed By James West.</u>

Information about two hostile events in the pre-1990 period was also excluded on the basis that it was harassment of other workers and was not witnessed by West directly.

A. <u>The 1989 Noose.</u>

In 1989, a white supervisor, Robert Laurino, allegedly waved a noose in front of another African-American in the shop and remarked, "You know what we use these for."  That worker, Vernon Smith, has since died, but Ronald Price was present at the time.  West and others soon learned of the incident.  At trial West's counsel attempted to question him concerning his knowledge.  The court sustained PECO's objections on the ground that West's testimony was hearsay.  App. at 107-8.

On appeal, West explains that his own testimony was intended to provide the jury with information concerning how reports of the incident affected him.  As a competent witness to testify as to the incident itself, West contends that he would have presented Price had it not been for the court's earlier, repeated warnings to remain within the 300-day period when questioning Price.

As with the Ku Klux Klan card, West claims that preclusion of this evidence was prejudicial beyond the mere fact that it was an important incident helping to establish the pervasive and continual nature of the hostile work environment.  He suggests that it also sheds light on a similar incident occurring within the 300-day period.  At trial, the court admitted evidence of a large noose that hung near the storeroom, by the building's exit door, during the summer of 1990.  According to Price's testimony, this second noose was full-size, made of thick burlap rope, with a circular wrapping that could be

adjusted so as to place a head through it.  App. at 69, 73-77.
The noose appeared at the same time as the Ku Klux Klan pictures,
in June 1990.  It was placed approximately 20 feet from one of
the Klan pictures.  Like the pictures, it was removed in August
1990.

Finally, plaintiff argues that evidence of the 1989
noose incident was important because Smith filed a complaint
about it with PECO's Affirmative Action Office.  This
information, in turn, would have been a part of West's
presentation to establish that PECO knew of the alleged hostile
work environment.

B.        The Black Doll.

In 1989, Esbiornson placed a photocopy of a figure on
the side of his desk, facing Smith.  West suggests that it was a
black "voodoo doll," intended to harass Smith because he had
argued with Esbiornson the day before.  PECO claims that it was a
"malady doll," listing a variety of physical ailments, intended
to protect the workers in the shop from further illness.

At the hearing on the motion in limine, the court made
a provisional ruling that it would admit the evidence for
purposes of notice because Smith had filed a complaint with
PECO's Affirmative Action Office.  The superintendent of the
meter shop, William Barrett, investigated the incident and kept
notes of his interviews with Smith and Esbiornson.  App. at 48-
51, 53.  However, at another pretrial conference, PECO sought

reconsideration. The court then excluded all evidence pertaining to both the incident and the report, on the ground that, because West was not personally subject to the incident, it could not constitute part of his working environment. App. at 53-54; 111-12. Again, West argues on appeal that this evidence was vital to his case as it was probative of both the continuing racial hostility at the meter shop and of PECO's knowledge of and duty to remedy the alleged hostile work environment.

C.

After a five day trial, with the above evidence excluded, the jury found that West had failed to prove that PECO knowingly permitted a hostile work environment to exist at the meter repair shop. The jury also found that PECO had not retaliated against West because he had filed administrative charges. The district court entered judgment in PECO's favor on June 11, 1993, and West filed this timely appeal. West argues on appeal that the district court erred in emphasizing the 300-day filing period as a basis for determining the admissibility of evidence and for imposing a "same actor, same conduct" requirement before a continuing violation could be established.[6] For the reasons which follow, we agree.

_____

[6] West also claims error in the exclusion of one piece of evidence from within the 300-day period, for reasons having nothing to do with the filing period and continuing violations theory. In his pre-trial order on the motion in limine, the court excluded evidence pertaining to the "animal head incident." Order of May 26, 1993. See App. at 47-48. This notation refers to the fact that in 1990, while he was attending a high school gym meet, Price's truck was vandalized when a freshly killed

II.

The district court had subject matter jurisdiction over plaintiff's federal statutory claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claim pursuant to 28 U.S.C. § 1367.  We exercises appellate jurisdiction pursuant to 28 U.S.C. § 1291.

We review the evidentiary determinations of the trial court under an abuse of discretion standard.  Glass v. Philadelphia Electric Co., 34 F.3d 188, 191 (3d Cir. 1994); In re Merritt Logan, Inc., 901 F.2d 349, 359 (3d Cir. 1990).  In the context of a decision to admit or exclude evidence under Fed. R.

---

deer's head was tied to its hood.  The court excluded this evidence under Fed. R. Evid. 403, which provides, in relevant part:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . .

We review exclusions under Rule 403 only for abuse of discretion.  In this case, we cannot say that the trial court's decision was "arbitrary and irrational."  This incident occurred more than 40 miles from the workplace.  There was no direct evidence linking any of PECO's employees to the deer head.  The circumstantial evidence offered showed that some of the white PECO workers enjoyed deer hunting, that they discussed hunting at work, and that one of the workers ate deer meat at work.  Given this weak connection to PECO, the probative value of the evidence was slight.  And on the other side of the Rule 403 balancing, the incident was appallingly grotesque and abusive of Price.  As such, admission of the evidence would have run the risk of inducing unfair bias in favor of Price and, potentially, unfair bias against PECO.

Evid. 403, an abuse of discretion exists where that decision is shown to be "arbitrary and irrational." Bhaya v. Westinghouse Electric Corp., 922 F.2d 184, 187 (3d Cir. 1990), cert. denied 111 S.Ct. 2827 (1991). However, as to the application or interpretation of a legal standard underlying the admissibility decision, our review is plenary. See Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102 (3d Cir. 1981)("[t]o the extent the parties challenge the choice, interpretation, or application of legal precepts, we always employ the fullest scope of review").

Our determination that the trial court erred in an evidentiary determination does not, however, end our review. An erroneous decision to admit or exclude evidence does not constitute reversible error unless "a substantial right of the party is affected . . .." Linkstrom v. Golden T. Farms, 883 F.2d 269, 269 (3d Cir. 1989); Fed. R. Evid. 103(a). Nonconstitutional error in a civil suit may be deemed harmless "if it is highly probable that the error did not affect the outcome of the case." Lockhart v. Westinghouse Credit Corp., 879 F.2d 43, 53, 59 (3d Cir. 1989).

III.

A.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has recognized that Title VII's protection is not limited to "economic" or "tangible" discrimination, such as the denial or loss of a job or promotion. It is violated as well by a "work environment abusive to employees because of their race, gender, religion, or national origin." Harris v. Forklift Systems, Inc., 114 S.Ct. 367, 371 (1993). See also Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405 (1986) ("a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment.").

To be cognizable within the meaning of Title VII, harassment, whether based on race or sex,[7] must affect a "term, condition, or privilege" of the plaintiff's employment. In Meritor, the Court held that the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" 477 U.S. at 67. Recently, in Harris, the Court explained that this standard is intended to

_____

[7] The Court has recognized no difference in standards applicable to racially and sexually hostile work environments. See Harris 114 S.Ct. at 371; 114 S.Ct. at 373 (Ginsburg, J., concurring)("Title VII declares discriminatory practices based on race, gender, religion, or national origin equally unlawful"); Meritor, 477 U.S. at 66.

> take[] a middle path between making
> actionable any conduct that is merely
> offensive and requiring the conduct to cause
> a tangible psychological injury.

114 S.Ct. at 370.

In Andrews v. City of Philadelphia, 895 F.2d 1469 (3d Cir. 1990), we discussed the standard of liability for a hostile work environment claim.  First, we adopted what has become known as a "totality of the circumstances" approach.

> To bring an actionable claim for . . .
> harassment because of an intimidating and
> offensive work environment, a plaintiff must
> establish 'by the totality of the
> circumstances, the existence of a hostile or
> abusive working environment . . . .'

Id. at 1482 (citing Vance v. Southern Bell Tel. and Tel. Co., 863 F.2d 1503, 1510 (11th Cir. 1989)).  See also Spain v. Gallegos, 26 F.3d 439, 451-52 (considering all the circumstances, plaintiff should be allowed opportunity to prove claims regarding sexually hostile work environment).  This approach has been endorsed by the Supreme Court:

> [W]e can say that whether an environment is
> "hostile" or "abusive" can be determined only
> by looking at the circumstances.  These may
> include the frequency of the discriminatory
> conduct; its severity; whether it is
> physically threatening or humiliating, or a
> mere offensive utterance; and whether it
> unreasonably interferes with an employee's
> work performance.

Harris, 114 S.Ct. at 371.  In addition, in Andrews, we set forth five elements necessary to establish a successful hostile work environment claim:

(1) the plaintiff suffered intentional discrimination because of his or her membership in the protected class;

(2) the discrimination was pervasive and regular;

(3) the discrimination detrimentally affected the plaintiff;

(4) the discrimination would have detrimentally affected a reasonable person of the same protected class in that position; and,

(5) the existence of respondeat superior liability.

895 F.2d at 1482.

The use of both a subjective and an objective standard (parts 3 and 4 above) also was explicitly adopted by the Supreme Court in Harris:

Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

114 S.Ct. at 370.

B.

West's claim, that PECO knowingly permitted a hostile work environment to exist for its African-American workers at the meter repair shop, is governed by these standards.  At trial,

West attempted to proffer evidence which, if credited by the jury, could have established the five elements above. However, it was this precise breadth of West's evidence, demonstrating that the alleged harassment was "pervasive and regular," which the district court believed was in conflict with the statute. Despite the requirement that the harassment be pervasive and regular, the court concluded that the statutory filing period limited the proper scope of evidence admissible to prove the claim. The district judge in effect concluded that in regard to each individual actor, who West wished to demonstrate had participated in creating the hostile work environment, West had to prove that this individual had engaged in on-going violative conduct.

At trial, the judge explained to counsel: "You're proceeding under a certain section of the statute which has [a] certain time limitation on it. I've applied that time limitation and you may take it from that point all the way up to today." App. at 89-90. In that ruling and the rulings described above, the court was referring to Title VII's filing period. According to 42 U.S.C. 2000e-5(e), a charge of employment discrimination must be filed within 300 days "after the alleged unlawful employment practice occurred."[8] This filing is a prerequisite to

---

[8] The 300-day period applies where the plaintiff has initially instituted proceedings with a State or local agency. Otherwise, the applicable period is 180 days. 42 U.S.C. S 2000e-5(e).

a civil suit under Title VII.  Alexander v. Gardner-Denver Co.,
415 U.S. 36, 47, 94 S.Ct. 1011, 1019 (1974).

Though the requirement sounds exacting--300 days after
the alleged unlawful employment practice occurred--courts have
grappled with cases presenting questions of precisely when a
"practice" occurred.  That date may be more inflexible when there
is a discrete trigger event and the discrimination is overt.
However, there are cases in which the plaintiff does not know he
has been harmed; similarly there are cases of an ongoing,
continuous violation.  To accommodate these more indeterminate
situations, the Supreme Court has recognized that the filing of a
timely charge is "a requirement that, like a statute of
limitation, is subject to waiver, estoppel, and equitable
tolling."  Zipes v. Trans World Airlines, Inc., 455 U.S. 385,
393, 102 S.Ct. 1127, 1132 (1982); Oshiver v. Levin, Fishbein,
Sedran & Berman, ___ F.3d ___ (3d Cir. 1994).

One such equitable exception to the timely filing
requirement is the continuing violation theory.  Under this
theory, the plaintiff may pursue a Title VII claim for
discriminatory conduct that began prior to the filing period if
he can demonstrate that the act is part of an ongoing practice or
pattern of discrimination of the defendant.  Bronze Shields, Inc.
v. New Jersey Dept. of Civ. Serv., 667 F.2d 1074, 1081 (3d Cir.
1981), cert. denied, 102 S.Ct. 3510 (1982); Jewett v.
International Tel. and Tel. Corp., 653 F.2d 89, 91 (3d Cir),

cert. denied, 102 S.Ct. 515 (1981).  In fact, in Bronze Shields,
we cited with approval a Senate Conference Committee report
recognizing that "certain types of violations are continuing in
nature," making it appropriate to "measure[] the running time of
the required time period from the last occurrence of the
discrimination and not from the first occurrence."  667 F.2d at
1081.

To establish that a claim falls within the continuing
violations theory, the plaintiff must do two things.  First, he
must demonstrate that at least one act occurred within the filing
period:  "The crucial question is whether any present violation
exists."  United Airlines, Inc. v. Evans, 431 U.S. 553, 558, 97
S.Ct. 1885, 1889 (1977).  Next, the plaintiff must establish that
the harassment is "more than the occurrence of isolated or
sporadic acts of intentional discrimination."  Jewett, 653 F.2d
at 91.  The relevant distinction is between the occurrence of
isolated, intermittent acts of discrimination and a persistent,
on-going pattern.[9]

_____

[9]    In making this distinction, a number of the Courts of
Appeals have adopted the approach of the Fifth Circuit in Berry
v. Board of Supervisors of Louisiana State Univ., 715 F.2d 971,
981 (5th Cir. 1983) and Waltman v. International Paper Co., 875
F.2d 468, 474-75 (5th Cir. 1989).  We also find this approach,
providing a non-exhaustive list of factors, to be helpful.
Following the Berry court, the inquiry into the existence of a
continuing violation would consider:

(i)   subject   matter--whether   the   violations
      constitute  the  same  type  of  discrimination;
      (ii) frequency; and (iii) permanence--whether
      the  nature  of  the  violations  should  trigger

Once the plaintiff has alleged sufficient facts to support use of the continuing violation theory, however, the 300-day filing period becomes irrelevant -- as long as at least one violation has occurred within that 300 days. Plaintiff may then offer evidence of, and recover for, the entire continuing violation. At that point as well, the Federal Rules of Evidence and the substantive law at issue, rather than the statutory filing period, should govern evidentiary determinations of the trial court.

## C.

Throughout the trial, West maintained that the alleged hostile work environment satisfied the conditions of a continuing violation. Hostile work environment and continuing violation claims have similar requirements of frequency or pervasiveness. There is a natural affinity between the two theories. A number of courts, in fact, have remarked upon the correlation between the two:

> In the arena of sexual [or racial] harassment, particularly that which is based on the existence of a hostile environment, it is reasonable to expect that violations are continuing in nature: a hostile environment results from acts of sexual [or racial]

---

> the employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.

Martin v. Nannie and Newborns, Inc., 3 F.3d 1410 (10th Cir. 1993).

harassment which are pervasive and continue over time, whereas isolated or single incidents of harassment are insufficient to constitute a hostile environment. Accordingly, claims based on hostile environment sexual [or racial] harassment often straddle both sides of an artificial statutory cut-off date.

Jenson v. Eveleth Taconite Co., 824 F.Supp. 847, 877 (D.Minn. 1993). See also Waltman v. International Paper Co., 875 F.2d 468, 476 (5th Cir. 1989)("The Meritor Savings Bank decision is relevant to the continuing violation theory because a hostile environment claim usually involves a continuing violation."); Stair v. Lehigh Valley Carpenters Local No. 600, 813 F. Supp. 1112, 1115 (E.D. Pa. 1993). Moreover, this view is implicit in the many cases which, without discussing the issue of timeliness or admissibility, rely upon evidence of events, occurring long before the relevant filing periods, to establish a hostile work environment. See, e.g., Harris, 114 S.Ct. 367 (considering acts of harassment spanning two and one-half year period); Meritor, 106 S.Ct. 2399 (considering acts of harassment spanning four year period).

Although we decline to adopt a per se rule that a properly alleged hostile work environment claim also constitutes a continuing violation, we agree that West has alleged facts sufficient to support application of the continuing violations theory in this case. First, all of the incidents alleged by the plaintiff involved racial harassment--the nooses, the Klan pictures, the black doll, the harassing conversations and the

postings on the bulletin board.  Second, the incidents are alleged to have occurred consistently over the period since 1986, with increased frequency in 1989-1990.  The most physically threatening and hostile of the incidents--the large burlap noose and the Klan photographs--are alleged to have remained in the workplace for a period of months.  The postings, threats, and hostile conversations appear to have recurred without respite.  Finally, the harassment did not cause a discrete event such as a lost job or a denied promotion and, thus, it did not trigger a duty of the plaintiff to assert his rights arising from that deprivation.

Despite these proffers, the trial court excluded much of West's pre-300-day evidence.  In effect, the court looked upon West's claims as individually focussed on particular workers or on particular forms of continuing conduct.  This strict application is not appropriate, however, in a claim of a racially hostile work environment where both the existence of hostility and the employer's awareness of hostility can long predate the 300-day period.

Here, the court required the plaintiff to stay within the 300-day period unless he could show a continuing violation by the same individual.  Thus, at the pre-trial conference the court ruled:  "You should plan to organize your evidence as to the 300-day period, and then you'd have to show as to something prior to that time, that the same actor was involved.  So if there was a

different actor, there would not be a continuing violation."
App. at 44. During the course of the trial, the court admitted
evidence of racially hostile postings dating back to 1986 because
it found that that specific form of harassment was sufficiently
regular and pervasive as to constitute a continuing violation.

The additional restrictions upon the continuing
violations theory were error. To prove a hostile work
environment, West had the burden of establishing that he suffered
intentional, pervasive, and regular racial discrimination of
which PECO supervisors and management were aware and which PECO
permitted to continue. Nowhere in the case law establishing
these standards is there a requirement that the discriminatory
conduct of each co-worker, who participated in creating the
hostile environment, be pervasive and/or on-going. We believe
that West proffered sufficient evidence to demonstrate that the
hostile environment was on-going. Once he had done so, evidence
of incidents of pre-300-day discriminatory activity was
admissible if the incidents were related to the overall hostile
environment.

In contrast to the limitations imposed by the trial
court, our cases direct that a hostile work environment claim
should be addressed in the "totality of the circumstances."
Specifically, in Andrews, this court precluded an individualized,
incident-by-incident approach. 895 F.2d at 1485. We cautioned:

> A play cannot be understood on the basis of
> some of its scenes but only on its entire

> performance, and similarly, a discrimination
> analysis must concentrate not on individual
> incidents, but on the overall scenario. . . .
> The factfinder in this type of case should
> not necessarily examine each alleged incident
> in a vacuum.  What may appear to be a
> legitimate justification for a single
> incident of alleged harassment may look
> pretextual when viewed in the context of
> several other related incidents.

Id. at 1484 (citation omitted).

The "totality" approach cannot support the "same actor" or "same form of discrimination" requirements imposed at trial here.  Because a hostile work environment claim is a single cause of action, rather than a sum of discrete claims, each to be judged independently, the focus is the work atmosphere as a whole.  If an employer knowingly (actually or constructively) permits a hostile work environment to exist, it is of no import that the collection of incidents comprising the claim were committed by a variety of individuals.[10]  Rather, by implicitly condoning harassing behavior, the employer may facilitate its spread by a greater number of harassing employees.  As one court has observed,

> A hostile work environment is like a disease.
> It can have many symptoms, some of which
> change over time, but all of which stem from
> the same root.  The etiology in this case is
> pure gender bias.

---

[10]  Similarly, in this regard, it was error to exclude evidence of notice of racial harassment given to PECO by other employees.  The company's notice of racial harassment is always relevant, regardless of its source, because it bears upon the duty of the company to investigate and to remedy a hostile work environment.

<u>Hansel v. Public Service Co.</u>, 778 F.Supp. 1126, 1132 (D. Colo. 1991). <u>See</u> <u>also</u> <u>Waltman</u>, 875 F.2d at 475 ("The fact that not all the incidents of harassment involve the same people does not show a lack of recurrence or frequency.") <u>Stair</u>, 778 F.Supp. at 1134 ("It does not matter that the form of harassment changed over time, nor does it matter that the identity of those responsible changed over time."). Moreover, in the present case, there was a fair overlap in the identity of the harassers in the incidents offered at trial.

We conclude that the trial court was also overly restrictive in its application of the "pervasiveness" requirement. At one stage, it precluded evidence of racially harassing comments because the plaintiff had not established that there was "daily contact" with the harasser. App. at 166-67. As the Supreme Court made clear in <u>Harris</u>, frequency is a factor to be considered, but it is to be considered in context, including the severity of the incidents.

> The number of incidents of harassment is but one factor to be considered in the totality of the circumstances. A Title VII plaintiff does not prove racial harassment or the existence of a hostile working environment by alleging some 'magic' threshold number of incidents.

<u>Daniels v. Essex Group, Inc.</u>, 937 F.2d 1264, 1275 (7th Cir. 1991). <u>See also</u> <u>Waltman</u>, 875 F.2d at 475-76 ("The fact that there were gaps between the specific incidents to which Waltman testified does not demonstrate a lack of continuity.").

Finally, the court's decision to exclude evidence of harassment of other African-Americans, not witnessed by West, was also in error. In some instances, evidence of harassment of others will support a finding of discriminatory intent with regard to a later incident.[11] For example, evidence of the 1989 noose incident was relevant to establish knowledge by PECO of racial animosity and discriminatory intent when the second noose appeared in the summer of 1990. Certainly, the jury's knowledge of the incident and its aftermath would have precluded defense counsel from arguing, in their opening statement, that the worker who made the second noose "did not understand it as being racially offensive or potentially offensive." App. at 59. Furthermore, evidence of harassment of other workers, because they were African-American, was relevant to an examination of West's claims that he, too, was harassed. Daniels, 937 F.2d at 1275 (evidence of harassment of others "serve[] to demonstrate that Daniels did not weave his allegations out of whole cloth, and bolster the confidence of the finder of fact in the plaintiff's veracity and in the objective reasonableness of his claims.").

IV.

_____

[11] Vance v. Southern Bell Tel., 863 F.2d 1503, 1511 (11th Cir. 1989)("[T]he jury could have properly considered evidence of discriminatory acts . . . directed at employees other than the plaintiff, as tending to show the existence of racial animus in the present case.").

For the foregoing reasons, we conclude that the district court abused its discretion by holding that pre-1990 evidence was not admissible as proof of a continuing violation of a hostile work environment unless it involved either the same actor or the same form of conduct.  Similarly, the exclusion of evidence that PECO was notified of allegedly discriminatory harassment prior to the 300-day period was error, as was the decision to preclude evidence of harassment of other African-Americans at the meter shop on the grounds that their harassment was irrelevant to West's claim of a hostile work environment.  We cannot say, with a sure conviction, that these errors did not prejudice the plaintiff in the presentation of his case to the jury.  We will, therefore, vacate the judgment of the district court and remand this case for a new trial.