Craig J. COMPTON

v.

NATIONAL LEAGUE OF PROFESSIONAL BASEBALL CLUBS, et al.

No. Civ.A. 96–4634.

United States District Court,
E.D. Pennsylvania.

Feb. 17, 1998.

---

556

Sol H. Weiss, Kristin Werner, Anapol, Schwartz, Weiss & Schwartz, P.C., Philadelphia, PA, for Plaintiff.

Charles B. Blakinger, Hoyle, Morris & Kerr, Philadelphia, PA, for Defendant.

### MEMORANDUM AND ORDER

DITTER, District Judge.

Plaintiff, a former professional baseball umpire, brings this action against various baseball associations claiming, *inter alia,* that he was the victim of "reverse discrimination" in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*[1] Defendants have filed a motion to dismiss or, in the alternative, for summary

**1.** The various defendants are the National League of Professional Baseball Clubs (National League), the American League of Professional Baseball Clubs (American League), the American Association of Professional Baseball Clubs (American Association), the National Association of Professional Baseball Clubs (National Association), and the Baseball Office for Umpire Devel- opment (BOUD). The American and National Leagues constitute the two major leagues of professional baseball; the American Association and the National Association constitute the minor leagues of professional baseball; and BOUD is an affiliate of all four and is responsible "for finding, evaluating, overseeing, training, developing, recommending, and supervising umpires for

judgment.[2] For the reasons that follow, I will grant defendants' dispositive motions as to plaintiff's Title VII claims and decline to exercise supplemental jurisdiction over the remaining state-law claims.

## I. *The Facts*[3]

For purposes of the defendants' motion to dismiss, I have accepted as true the following allegations in the plaintiff's complaint:

Craig Compton began his career as a professional minor league baseball umpire in 1984. (Compl. ¶ 14). Initially making the calls as a Class A minor league umpire, Compton was periodically promoted from Class A to Class AA to Class AAA—Class AAA being the highest minor league level. (*Id.* ¶¶ 14–23). Frequently, Compton was named umpire crew chief, a position assigned to the most qualified of umpires. (*Id.* ¶ 23(a)). Throughout his eleven-year career, Compton umpired numerous minor league all-star and playoff games and was praised for his ability on several occasions. (*Id.* ¶¶ 23, 23(c), 23(h), 24). Despite his expressed aspirations to umpire in the major leagues, Compton was not selected to be a major league umpire. (*Id.* ¶ 25). On October 27, 1994, the American Association of Professional Baseball Clubs (American Association) and the National Association of Professional Baseball Clubs (National Association) unconditionally released Compton, explaining that neither the American League of Professional Baseball Clubs (American League) nor the National League of Professional Baseball Clubs (National League) wanted to hire him to umpire in the major leagues. (*Id.* ¶ 26). This release ended Compton's career as a professional umpire and "finally determined that [he] would never be employed as an umpire in major league baseball." (*Id.*).

On January 20, 1995, a representative of the American League contacted Compton and requested that he return to umpire during the 1995 American League spring training and regular season. (*Id.* ¶ 28). Compton umpired all of spring training as well as five regular season games. (*Id.* ¶ 29). On May 2, 1995, the American League unconditionally released Compton from further employment for no good cause. (*Id.* ¶ 30). On November 9, 1995, Compton filed a complaint against the defendants alleging discrimination based on his status as a white male with the Equal Employment Opportunity Commission (EEOC) and the Pennsylvania Human Relations Commission (PHRC). (*Id.* ¶ 3). After exhausting his administrative remedies, Compton brought this federal-court action. (*Id.*).

In count I, Compton alleges that the defendants have engaged in an unlawful employment practice and continuing policy of discrimination against white males and thus have violated Title VII, 42 U.S.C. § 2000e–2(a)(1), by failing to hire or promote him, firing him, and otherwise discriminating against him because of his race. Count II is a parallel state-law claim alleging violations of the Pennsylvania Human Relations Act (PHRA). In count III, Compton asserts a breach of contract claim, in count IV, he claims he was wrongfully discharged with specific intent to harm, and in count V, Compton alleges that the defendants have committed the tort of intentional infliction of emotional distress. Finally, in count VI, Compton alleges that the defendants' actions in failing to hire white males constitute an unlawful restraint of trade in violation of the common law of Pennsylvania.

## II. *Discussion*

The defendants have challenged Compton's employment discrimination claims as follows. They break Compton's employment into two separate periods, his 1984–1994 employment in the minor leagues and his 1995 employment with the American League.[4] First,

---

all levels of professional baseball." (Compl. ¶ 10).

2. Initially, the American Association was not part of the defendants' motion; however, it later joined in the motion. (*See* doc. # 21).

3. Compton misnumbered the paragraphs in his complaint beginning at paragraph 23. Thus, for purposes of clarity, references made to the complaint in this opinion reflect my renumbering of the paragraphs after paragraph 23.

4. I agree with the defendants' division of Compton's employment. Although Compton consistently uses the word "defendants" throughout his complaint, his complaint clearly shows that he was employed first with the minor league associations and second with the American League.

applying the motion to dismiss standard, they state that the employment discrimination claims should be dismissed as to all the defendants because such claims are untimely.[5] Second, the American League has proffered evidence in support of a partial motion for summary judgment arguing that it is entitled to judgment in its favor on counts I and II.[6] I will consider the motion to dismiss as having been made by all five defendants— the American League, the National League, the American Association, the National Association, and the Baseball Office for Umpire Development (BOUD).

### A. *The Defendants' Motion to Dismiss*

■ In considering the defendants' motion to dismiss, I must accept as true the factual allegations in the complaint and draw all inferences in the plaintiff's favor. Only if the plaintiff can prove no set of facts in support of his claim that would entitle him to relief may I dismiss the complaint pursuant to Rule 12(b)(6). However, I do not have to accept as true any conclusory allegations. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 & n. 8 (3d Cir.1997). Ordinarily, I may not grant a motion to dismiss on the basis of an untimely filing; however, if it is apparent from the face of the complaint that the applicable statute of limitations has ex-

pired, I must dismiss the complaint. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n. 1 (3d Cir.1994) ("While the language of Fed.R.Civ.P. 8(c) indicates that a statute of limitations defense cannot be used in the context of a Rule 12(b)(6) motion to dismiss, an exception is made where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading."). In addition, the plaintiff has attached various exhibits to his complaint. Pursuant to Federal Rule of Civil Procedure 10(c), I may consider them when deciding this motion.[7] In deciding these particular arguments, I have not considered the affidavit or exhibits attached to the defendants' motion, nor have I considered Compton's affidavit in support of his opposition brief.

Generally, when alleging a claim pursuant to Title VII, a plaintiff must initiate charges within 180 days of the alleged discriminatory act. 42 U.S.C. § 2000e–5(e). However, if the plaintiff first filed a complaint with an appropriate state or local agency, the plaintiff then must file a charge of employment discrimination with the EEOC within 300 days from the date of the alleged discriminatory act. *Id.*[8] In order to determine whether

---

**5.** Pointing to Compton's employment from 1984 until he was discharged in 1994, the defendants contend that any employment discrimination claims based on that period that are alleged in counts I and II of the complaint are untimely. Compton's second employment period covered from January of 1995 to May of 1995, when the American League hired him as a major league umpire. The defendants do not contend that any discrimination occurring relating to this second period of employment is time-barred, and indeed it would not be so barred (May 2, 1995, being within 300 days of November 9, 1995). However, the American League attacks this second period of employment on its merits under the summary judgment portion of the motion. (*See* Defs.' Mem. in Support of Mot. at 2).

**6.** In support of its argument that it is entitled to summary judgment as to counts I and II of the complaint, the American League has attached the affidavit of Martin J. Springstead, Executive Director of Umpires of the American League of Professional Baseball Clubs. Attached to Mr. Springstead's affidavit are various documents. In response to this argument, Mr. Compton has submitted his own affidavit as well as a copy of his contract. Nowhere in his brief does he ob-

ject to my treating this portion of the motion as one for summary judgment, and indeed he has cited the legal standard applicable for deciding a motion for summary judgment. Moreover, he has had ample time with which to supplement the record, and he has not made any motion for additional discovery. Therefore, because I am considering matters outside the pleadings, I will treat this portion of the defendants' motion using the standard for a motion for summary judgment. *See Hilfirty v. Shipman*, 91 F.3d 573, 579 (3d Cir.1996).

**7.** To his complaint, the plaintiff attached a copy of his 1994 umpire contract with the National Association and a copy of the BOUD Retention Policy.

**8.** Similarly, the PHRC requires that the employee file a complaint within 180 days after the alleged discriminatory act. 43 Pa.Stat.Ann. § 959(h) (West Supp.1997). Although I am dismissing Compton's federal claim, I note that if Compton's 1995 discharge occurred on May 2, 1995 and he filed an administrative complaint with the PHRC on November 9, 1995, as he alleges in his complaint, his PHRA action is untimely, i.e., 191 days.

a claim has been timely filed, the Supreme Court has instructed me initially to "identify precisely the unlawful employment practice of which [the plaintiff] complains." *Delaware State College v. Ricks,* 449 U.S. 250, 257, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). Here Compton is complaining about the defendants' failure to promote him to the major leagues and his subsequent discharge in 1994 from the minor leagues as well as the American League's releasing him from his employment with it in 1995—all of which allegedly occurred because of his status as a white male.

The defendants argue that Compton's cause of action relating to his 1994 employment accrued, at the very latest, on October 27, 1994, the date he was released. Accordingly, the defendants maintain, his filing of charges with the EEOC and the PHRC on November 9, 1995, clearly exceeded his allotted time, and thus his claim is now barred.

In response, Compton argues that the facts he has alleged in his complaint demonstrate the timeliness of his claim under a "continuing violations" theory. In support of this argument, he refers me to an allegation in his complaint with respect to counts I and II that the defendants engaged in a continuous practice of discrimination against white males. (Compl.¶¶ 36, 39).

Clearly, the motion to dismiss as it relates to the American League must be refused because his employment with this league in 1995 was within the 300–day period. As to his minor league employment, however, I agree that the plaintiff's claims are untimely.

■ "[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). The Third Circuit has recognized that the time to file may be extended by operation of certain equitable principles. Two such principles are the discovery rule and the equitable tolling doctrine. *Oshiver,* 38 F.3d at 1385. In addition, the Third Circuit has held that under the continuing violations theory, a plaintiff may pursue a Title VII claim for discriminatory conduct

which began outside the limitations period if he can demonstrate that the conduct alleged constitutes an ongoing practice or pattern of discrimination effected by the employer and that such pattern extended into the statutory period. *Jewett v. International Tel. & Tel. Corp.,* 653 F.2d 89, 91–93 (3d Cir.1981).

■ Under the discovery rule, Compton's cause of action would accrue on the date that he discovered that he had been injured, *Oshiver,* 38 F.3d at 1385, and this is so even if he was not then aware that such injury constituted a legal wrong. *Id.* at 1386. With respect to the first period of employment, clearly Compton discovered that he was injured on the date he was released, October 27, 1994. At that point he "became aware (1) that [he] had been injured, i.e., discharged, and (2) that this injury had been caused by another party's conduct." *Id.* at 1391. Thus, the application of the discovery rule does not save his discrimination claim.

■ Similarly, the doctrine of equitable tolling halts the running of the statute of limitations based upon various equitable considerations. *Id.* at 1387. "[T]here are three principal, though not exclusive, situations in which equitable tolling may be appropriate: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." *Id.*

■ However, this is not a case where Compton filed timely charges in the wrong forum. Further, nowhere in his complaint does Compton allege that the defendants misled him into sleeping on his rights after the 1994 termination. Only in his opposition brief does Compton state that "Defendants' policy of discrimination revealed itself to [me] following [my] 1995 termination. [I] filed [my] Complaint only after realizing that Defendants' failure to hire and promote [me] to the position of Major League umpire and its discharge of [me] from [my] employment as an umpire in professional baseball—while hiring and promoting non-whites with less skill and expertise—are part of a continuing policy of discrimination against white

males." [9] (Plf.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss at 21); *see Pennsylvania v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir.1988) ("It is one thing to set forth theories in a brief; it is quite another to make proper allegations in a complaint."). In addition, the allegations in his complaint show that the alleged practice or policy occurred "prior and subsequent to" his discharge. Finally, because Compton does not plead any extraordinary reason justifying his delay in filing, application of the doctrine of equitable tolling is not warranted.

▉▉▉ Thus, only if the continuing violations theory applies can relief be granted to Compton on his claims of employment discrimination. However, Compton may not invoke the continuing violation theory to revive claims concerning discrimination concluded in the past, even though its effects persist. *Ricks*, 449 U.S. at 257. In order to invoke the continuing violations theory, Compton must properly plead facts supporting that theory. Initially, he "may pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir.1995). In other words, Compton first needs only to allege that, pursuant to a "standard operating procedure," the defendants intentionally discriminated against the class of which he was a member, here white males. *See Jewett*, 653 F.2d at 91–92.[10] Second, Compton must allege facts showing the application of the ongoing discriminatory practice to him at least once within the statutory period. *Courtney v. La Salle Univ.*, 124 F.3d 499, 506 (3d Cir.1997). "The time for filing a charge runs

from the most recent *application of the policy to plaintiff*, regardless of when he received notice of the policy and its prospective effect on him." *Id.* (emphasis added). "Once the plaintiff has alleged sufficient facts to support use of the continuing violation theory, ... the 300–day filing period becomes irrelevant—as long as at least one violation has occurred within that 300 days." *West*, 45 F.3d at 755.

▉▉▉ In his complaint, Compton avers that "[d]uring the period of [my] employment as a minor league umpire, and through to the present, the defendants engaged in a continuing practice of improper and illegal racial discrimination in hiring, maintaining and promoting non-white umpires having inferior experience, qualifications and abilities to those of white umpires such as [myself]." (Compl.¶ 27). Compton further alleges that "[t]he conduct of the defendants represents a continuing policy of discrimination against white males in that the defendants have continuously hired, maintained and promoted non-white umpires in preference to white umpires with superior qualifications, skills and experience. This practice has existed prior and subsequent to [my] discharge from [my] employment as a professional baseball umpire and still continues to date." (Compl.¶¶ 36, 39).

Although Compton uses the word "defendants" in the conclusory allegations of his complaint, this generality is clearly contradicted by the more specific references in his complaint describing which defendant did what to him and when and by the lack of any allegation that the defendants were acting in concert with each other at any time during the tenure of his employment as a professional umpire. Nor is there any allegation

---

**9.** Even here Compton does not say he was misled but only that he did not at once realize that his release was part of an ongoing policy.

**10.** When determining whether a party has satisfied this first requirement, the Third Circuit has urged courts to consider the following factors: "(1) subject matter—whether the violations constitute the same type of discrimination; (2) frequency; and (3) permanence—whether the nature of the violations should trigger the employee's awareness of the need to assert [his] rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate."

*West v. Philadelphia Elec. Co.*, 45 F.3d 744, 755 n. 9 (3d Cir.1995) (citing with approval factors enunciated in *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir.1983)). Here, it is clear from the face of the complaint that Compton would not be able to satisfy the third factor. His release in 1994 should have prompted him to take action to assert his rights. Indeed, Compton fully admits that this particular discharge ended his career as a professional umpire and "finally determined that [he] would never be employed as an umpire in major league baseball." (Compl.¶ 26). It is difficult to imagine what additional triggering events Compton needed.

that the acts of one defendant are to be attributed to all defendants.[11] From the face of the complaint, it is clear that Compton worked for the minor league associations until October 27, 1994, and for the American League for a short time in 1995. He first filed charges on November 9, 1995. Thus, with respect to the minor league defendants, the National League, and BOUD, no alleged violation occurred to him within the 300-day period.[12] *See West,* 45 F.3d at 755; *see also EEOC v. Westinghouse Elec. Corp.,* 725 F.2d 211, 218–20 (3d Cir.1983) (finding that when alleged unlawful practice is adoption and implementation of discriminatory policy, cause of action accrues when discrimination manifests itself by virtue of policy *actually being applied to complaining employees* ) (emphasis added), *disagreed with on other grounds, Public Employees Retirement Sys. of Ohio v. Betts,* 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989). Here, the alleged discriminatory policy regarding his minor league employment applied to Compton on October 27, 1994, and thus his Title VII claim in connection with that period of employment is untimely.

The instant case is distinguishable from *Bethel v. Jendoco Construction Corp.,* 570 F.2d 1168 (3d Cir.1978), where the Third Circuit reversed the district court's dismissal of the plaintiff's Title VII claim even though plaintiff was discharged outside of the statutory period. In that case, like this case, the plaintiff alleged in the complaint "violations of Title VII by defendant which continue 'to the present.' " *Id.* at 1175 & n. 14. However, the court recognized that the complaint alleged that the plaintiff had made "multiple job applications" after his discharge but that

the defendants refused to hire him because of his race and that they had "employed few or no other black persons as a carpenter for the past eleven (11) years." *Id.* at 1175. In contrast, here there is no allegation by Compton that he continued to apply for an umpire position after his discharge or that the defendants had not hired or promoted a white umpire in the past several years.

Because Compton's claim cannot be revived by his mere assertion of the continuing violations theory and because he did not bring his claim within 300 days of his termination as a minor league umpire, his claim must be dismissed as to the National League, the American Association, the National Association, and BOUD.

### B. *The American League's Motion for Summary Judgment*[13]

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[14] Fed.R.Civ.P. 56(c). In deciding the American League's motion for summary judgment, the evidence must be viewed in the light most favorable to Compton, all reasonable inferences must be drawn in his favor, and, where the evidence he cites contradicts that invoked by the American League, I must take Compton's evidence as true.

The American League seeks summary judgment with respect to any allegations of employment discrimination in counts I and II relating to its hiring and discharging of Compton from January of 1995 until May of 1995. In support of its motion, the American League has submitted the affidavit of Martin J. Springstead, who is Executive Director of Umpires for the American League.[15] Also,

---

**11.** His allegation in paragraph 13 of the complaint that the defendants "are all subject to the common oversight and direction of the Commissioner of Major League Baseball, who is appointed by the National and American Leagues," does not suggest that the defendants acted in concert, and, in any event, Compton has not named the Commissioner of Major League Baseball as a defendant in this case.

**12.** Indeed, the facts alleged do not support any claim of discrimination against the National League.

**13.** In his opposition brief, Compton appears to be of the mistaken belief that all defendants seek

summary judgment with respect to counts I and II. (*See* Plf.'s Opp'n at 24–29).

**14.** A fact is material if it could affect the outcome of the suit after applying the substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Further, a dispute over a material fact must be "genuine," i.e., the evidence must be such "that a reasonable jury could return a verdict in favor of the non-moving party." *Id.*

**15.** Springstead has held this position since January 1, 1986.

among other items, the American League attaches to Springstead's affidavit two letters signed by Compton covering his employment with the American League during both the 1995 Spring Training season and the 1995 regular season.

In his affidavit, Springstead states that Compton was hired in 1995 solely to replace the regular major league umpires who were currently striking based on a dispute over their collective bargaining agreement. (Springstead Aff. ¶¶ 4–6). Both letters, dated February 23, 1995, and March 30, 1995, respectively, clearly state that Compton's employment was to continue "during the course of the current labor dispute between the American and National Leagues and the Major League Umpires' Association," and that "[his] engagement [was] temporary in nature and w[ould] extend only for the course of the [1995 Spring training games or 1995 Regular Season games] during the continuance of the labor dispute." (*Id.*, Attachs. 1, 2.). The American League sent identical letters to all its temporary umpires. (Springstead Aff. ¶ 9). When the labor dispute ended, the American League terminated not only Compton's employment, but also the employment of all replacement umpires. (*Id.* ¶ 12). Springstead concludes his affidavit by stating, "Mr. Compton was treated no differently with respect to the end of his employment with the American League than any of the other temporary replacement umpires were treated. His employment ended when the umpire labor dispute ended, as provided by his letter agreement." (*Id.* ¶ 13).

Focusing my attention on the above evidence, the American League contends that Compton's claims of employment discrimination relating to this temporary period of employment in 1995 fail because Compton has not proven an essential element of his case. Specifically, the American League argues that Compton has not met his burden of introducing evidence showing that "similarly situated employees were not treated equally." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). As testified to by Springstead, all replacement umpires were treated the same, i.e., all were released when the labor dispute ended. Further, the American League argues that Compton's signing

the letter agreements manifests his understanding that his employment was temporary in nature.

In opposition to the American League's argument, Compton maintains that genuine issues of fact exist which defeat the motion for summary judgment. As evidence, Compton points to his affidavit filed with the EEOC on October 26, 1995, in which he allegedly supported his claim that "Major League Baseball hires and maintains minority [u]mpires while terminating white [u]mpires regardless of ability" by identifying four non-white individuals who were allegedly promoted or retained despite the presence of more qualified white candidates. (Plf.'s Mem. of Law in Opp'n to Defs.' Mot., Ex. B at 2). He also points to the allegations in his complaint that he received numerous awards, honors, and evaluations. Compton then directs my attention to his statement in his affidavit that Branch Rickey, the American Association President, told him that he did not understand or agree with Compton's October 24, 1994, termination.

Compton next outlines what he considers deficient in the American League's motion. Specifically, Compton argues that Springstead's affidavit is self-serving, that the American League has not provided any breakdown of temporary umpires by race and gender or indicated if any of these temporary umpires were subsequently rehired, and that Springstead failed to represent in his affidavit that Compton was treated equally *during* his employment with the American League.

I do not find Compton's arguments or the evidence he presents sufficient to withstand that provided by the American League. Although not articulated by any of the parties, from Compton's allegation that the conduct of the defendants in discriminating against him because of his race "was at all times undertaken maliciously, wantonly, willfully, knowingly, and in intentional disregard" of his rights, (*see* Compl. ¶ 32), I can only assume that Compton is proceeding under a disparate treatment theory of discrimination. Accordingly, in order to establish a prima facie case of discrimination, Compton must present facts from which a reasonable

finder of fact could conclude that 1) he was a member of a protected class,[16] 2) that he was qualified for the position, and 3) that by his discharge, he was treated less favorably than minorities possessing inferior qualifications. *See generally McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (stating that proof necessary to establish prima facie case will vary in accordance with differing factual scenarios). After that, the defendant assumes a burden of producing a legitimate, non-discriminatory reason for the plaintiff's discharge. If the defendant carries that burden, the burden shifts back to the plaintiff who must submit evidence from which a reasonable fact finder could conclude that the defendants' proffered reason is mere pretext or that his discharge was more likely the result of some discriminatory motive. *Fuentes v. Perskie,* 32 F.3d 759, 763–65 (3d Cir.1994).

Here, while Compton may have produced evidence showing that he was a member of a protected class, that he was qualified, and that he was discharged, he has failed to show that he was treated any less favorably than minorities with lower qualifications. His conclusory statement regarding major league's hiring practices—without any factual proof—is simply inadequate. Although providing the names of various allegedly less-qualified individuals, Compton provides no further details surrounding their qualifications as contrasted with his, nor does he supply the times and dates they were employed with the defendants. Further, his reference to what the American Association president may have said to him regarding his termination in 1994 is irrelevant to his employment with the American League in 1995. In short, Compton has failed to introduce any evidence, much less persuasive evidence, in support of his claims. Although the burden

of establishing the elements of a prima facie case is not onerous, in the instant case, even the most deferential reading of the evidence fails to support a finding in Compton's favor.

■ Moreover, if I were to find that Compton has established his prima facie case, the American League has met its burden of providing a legitimate, non-discriminatory reason for his discharge—the resolution of the labor dispute which the contracts, signed by Compton, clearly state would result in the end of his employment as a replacement umpire. At that point, the burden swings back to Compton to show that this reason was pretext or that more likely than not the real reason for his discharge was discrimination. Compton has failed to show even an ounce of credible evidence in this regard, and thus I must grant the American League's motion for summary judgment.

### III. *Dismissal of the Remaining State-law Claims*

■ As the defendants correctly argue, despite Compton's allegation in his complaint to the contrary, diversity of citizenship pursuant to 28 U.S.C. § 1332(a) does not exist. Here, given the defendants' structure as unincorporated associations, Compton cannot show that his citizenship is diverse from every member comprising each of the respective defendants. *See Carden v. Arkoma Assocs.,* 494 U.S. 185, 195–96, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990) (adhering to its "oft-repeated rule that diversity jurisdiction in a suit by or against the entity depends on the citizenship of all the members, the several persons composing such association, each of its members") (internal quotations and citations omitted).[17]

■ After dismissing Compton's sole federal claim, Title VII, I possess the discre-

---

**16.** Because Compton is claiming reverse discrimination, some courts have held that he is therefore held to a stronger showing of proof demonstrating that his employer is the unusual employer who discriminates against the majority. *See Harding v. Gray,* 9 F.3d 150, 153 (D.C.Cir.1993); *Notari v. Denver Water Dep't,* 971 F.2d 585, 588–89 (10th Cir.1992); *Davis v. Sheraton Soc'y Hill Hotel,* 907 F.Supp. 896, 899–900 (E.D.Pa.1995) (Joyner, J.). The Third Circuit has not yet addressed this issue and because I find,

in any event, that Compton has failed to carry his burden to allow a reasonable fact finder to disbelieve the defendants' proffered reason as pretext, I need not decide this issue.

**17.** In his opposition brief, Compton does not repeat his allegation that diversity of citizenship exists in this case. Rather, his sole argument regarding this issue is that I have jurisdiction based upon his Title VII employment discrimination claim.

tion to hear the remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction....").  Because I have dismissed Compton's sole federal claim prior to the parties expending any substantial time in discovery on this claim, I will decline to assume supplemental jurisdiction over the remaining state-law claims so as to best serve the values of judicial economy, convenience, fairness, and comity.  *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

An appropriate order follows.

### *ORDER*

AND NOW, this 17th day of February, 1998, upon consideration of Defendants' Motion to Dismiss or in the Alternative, for Summary Judgment, Plaintiff's Response, and Defendants' Reply, it is hereby ordered that:

1.  Count I of Plaintiff's complaint is DISMISSED as to Defendants National League of Professional Baseball Clubs, the American Association of Professional Baseball Clubs, the National Association of Professional Baseball Clubs, and the Baseball Office for Umpire Development.

2.  Defendant American League's Motion for summary judgment is GRANTED with respect to count I of Plaintiff's complaint and JUDGMENT is entered in favor of the American League and against Plaintiff.

3.  All remaining claims are DISMISSED pursuant to 28 U.S.C. § 1367(c)(3).