**Tony PHILLIPS, Plaintiff,**

v.

**William L. HEYDT and City of Allentown, Defendants.**

No. 00–CV–5486.

United States District Court, E.D. Pennsylvania.

April 18, 2002.

---

---

Fredrick E. Charles, Allentown, PA, for plaintiff.

Platte V. Moring, III, White & Williams, LLP, Allentown, PA, for defendants.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Plaintiff Tony Phillips ("plaintiff" or "Phillips") has filed suit against his employer, the City of Allentown ("city" or "Allentown") and its mayor, William Heydt ("mayor" or "Heydt") (collectively "defendants"), alleging that the defendants violated his rights under the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) et. seq., the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 et seq., and 42 U.S.C. § 1981 ("Section 1981"). Phillips claims that these violations began in the early 1980s and continued until the time this action was filed in October 2000. Phillips, who is a black police officer in Allentown, asserts that during this period the defendants subjected him to a hostile work environment and denied him all of the benefits and privileges of his contractual relationship with them. On May 6, 1998, plaintiff filed his charge with the EEOC and the Pennsylvania Human Relations Commission ("PHRC"), received a Notification of Right to Sue on August 3, 2000, and instituted the current action on October 27, 2000. Phillips is seeking compensatory damages on all claims, punitive damages on his § 1981 claim, and any other relief this court deems appropriate. On October 22, 2001, plaintiff moved for partial summary judgment and defendants moved for summary judgment. Now before me are those motions.

### FACTUAL BACKGROUND [1]

Plaintiff, Tony Phillips, joined the Allentown Police Department in 1982 and in May 1992 was promoted to the rank of sergeant, which he currently holds (Dep. of Phillips, 17, 24). In 1982, at about the time Phillips joined the police force, he and other members of the police department noticed that Michael Combs, an officer in the department, wore a swastika pin on his police uniform and also made racist comments. No one lodged a complaint. (Internal Affairs Investigation of Combs, 42–43).[2] Sometime in 1988 or 1989, Phillips observed a Ku Klux Klan (KKK) photograph on Combs' desk. Twenty other individuals made similar observations of offensive items in Combs' office, including German and Nazi memorabilia, a bust of Hitler, and a Confederate flag. Though Combs admits to having these items in his office, he contends that they were the fruits of search warrants and drug raids, rather than chosen decoration. (Internal Affairs Investigation of Combs, 44–45). In

---

1. The facts discussed have been considered in the light most favorable to the plaintiff. While both parties have filed motions for summary judgment, the plaintiff's motion does not involve a factual dispute, and instead seeks to bar the defendants from raising an affirmative defense. Because recitation of the factual background is irrelevant to the disposition of that motion, it is unnecessary to consider the facts in the light most favorable to the defendants.

2. The investigation report itself does not include page numbers. However, it has been stamped with page numbers in the version submitted as part of the defendants' statement of uncontested facts. These are the page numbers I have utilized.

1990, following an incident when a reporter and photographer from *The Morning Call*, the local newspaper, observed these items in his office, Chief Wayne Stephens ordered Combs to remove them and he complied.[3] (Internal Affairs Investigation of Combs, 38). Captains Robert Manescu and Thomas Bennis also claim that at various times between 1982 and 1986, Combs gave them white supremacist literature. (Internal Affairs Investigation of Combs, 45–46). Officer Rafael Perez, a Puerto Rican officer, alleges that in the spring or summer of 1989, Combs marched passed his desk with a burning Puerto Rican flag. (Internal Affairs Investigation of Combs, 51). Additionally, several members of the police department testified that they felt as if Combs had directed them to focus their attention on black criminals rather than white ones. (Internal Affairs Investigation of Combs, 48–49). During a 1995 internal affairs investigation of a black officer, Combs stated that because the officer lived in such a nice home, he must be a drug dealer. Subsequently, the target of that investigation, Sergeant Walter Felton, was fully exonerated of any wrongdoing, (Dep. of Felton, 66–67).

While numerous members of the Allentown Police Department witnessed these events over the course of a decade, no one lodged any sort of official complaint against Combs. On January 12, 1996 the police department promoted Combs to the rank of captain. On November 14, 1996, an article appeared in *The Morning Call* that detailed interviews with members of the department that had described the allegations against Combs. Two days later, on November 16, 1996, Mayor Heydt ordered an inquiry and an instituted an internal affairs investigation led by Captain Paul Snyder. (Internal Affairs Investigation of Combs, 39–40). Over the course of several months, the panel interviewed 92 people, met repeatedly, conducted independent investigation, and issued their report on April 22, 1997. (Internal Affairs Investigation of Combs, 41).

On April 30, 1997, at a press conference, Mayor Heydt and Chief Monahan made the results of the investigation public and discussed them. The report cleared Combs of the most serious allegations, finding them either unsustained or unfounded, but sustained the allegations that Combs had displayed Nazi memorabilia in his office and engaged in verbal insensitivity towards certain ethnic and religious groups.[4] (Internal Affairs Investigation of Combs). Based upon these findings, the mayor and chief decided that the appropriate punishment was to require Combs to attend sensitivity training. The police chief and mayor indicated that Combs' conduct warranted no further sanction because Chief Stephens had reprimanded Combs in 1990 for displaying the memorabilia, most of the events took place seven or eight years prior to the complaint, and the panel was unsure Combs had intended offense with his comments and actions. Moreover, Combs expressed remorse for any offense he caused, maintained a pristine record during his tenure, and the intense public scrutiny of his actions hurt

---

3. Plaintiff's allegations encompass the tenure of four chiefs of police in the City of Allentown. Wayne Stephens became chief in the late 1980s and was succeeded by John Stefanik in 1993. When Stefanik retired in 1996, Gerald Monahan became Chief of Police. Finally, upon Monahan's departure in 1999, Carl Held assumed the position.

4. The report actually sustained a third allegation, that Combs had attended the rallies of certain white supremacist groups, but noted that he had done so in his professional capacity as a member of the vice squad, which in effect, exonerated him of that charge. (Internal Affairs Investigation of Combs, 51–52).

Combs both personally and professionally. (Mayor Heydt's Comments and Press Conference Releasing Combs Report, 63).

The following week, on May 7, 1997, Chief Monahan met with minority members of the police department to discuss their concerns with the outcome of the Combs investigation and the limited sanction he received. Plaintiff attended that meeting and at that time, as he did subsequently, expressed criticism of Monahan, Heydt, and the entire investigation. (Aff. of Gerald M. Monahan at ¶ 13). Plaintiff contends that following his cooperation in the Combs investigation and his criticism of it, the defendants subjected him to "subtle" forms of harassment. (EEOC Determination, April 12, 1999). Also at that meeting, Officer Solivan indicated that at a change of shift the previous month, Lieutenant John Kerrigan used the expression "nigger knocker" to describe a car horn. Though the statement was repeated twice, in the presence of many officers, plaintiff was not there and heard about the comment afterwards. (Dep. of Phillips at 139–40).

Phillips encountered additional troubles in May 1997. On April 28, 1997, an individual named Nestor Vargas complained about the conduct of an Officer Perez in a letter to the police department. Subsequently, Vargas supplemented his complaint and alleged that he had witnessed several members of the police force smoking marijuana in 1989. Vargas did not mention Phillips in these allegations, but when the officer in charge of the investigation interviewed Vargas again on May 6, 1997, he included Phillips among those officers. (Mem. from Lt. Joseph Hanna to Captain Paul Snyder, May 9, 1997). At a third interview, on May 29, 1997, Vargas insinuated that he manufactured his claim against Phillips so he would know "what it feels like [to be the target of an investigation]." The department did not investigate whether Combs had encouraged Vargas to file this complaint. The investigation fully exonerated Phillips and the department did not subject him to any discipline. (Mem. from Captain Ronald Manescu to Chief Gerald Monahan Jr., July 23, 1997). Phillips, however, expressed dissatisfaction with the investigation and pursued criminal charges against Vargas for filing a false complaint—an offense of which he was eventually found guilty. Plaintiff pursued this claim without the support of his superiors and indicates that on September 10, 1997, Chief Monahan wrote to him, hoping to "derail this arrest." (Pl.'s Statement of Contested Material Facts at ¶ 33(g)).

On September 14, 1997, Phillips arrived at work at approximately 10:15 P.M. to begin work on the night shift. After completing some administrative tasks, he approached his car to respond to a call. As he neared the vehicle, Phillips observed a doll's head wedged between the steering wheel and dashboard. Upon closer inspection, he noticed that the eyes of the doll had been poked out and its face was soiled or "blackened." Phillips immediately expressed his belief that the doll's head constituted retaliation for participating in and complaining about the Combs investigation and was an attempt at ethnic intimidation. (Dep. of Phillips at 148–52). The police department responded by instituting an internal affairs inquiry and assigned Captain Manescu to investigate. After examining the physical evidence and interviewing members of the department, Manescu determined that the evidence failed to support the allegations. (Mem. from Captain Ronald Manescu to Chief Gerald Monahan, Jr., October 1, 1997). Several of the officers interviewed admitted to having been in possession of the doll's head over the course of the day and eventually Sgt. Michael Popovich left the doll in the car as a

practical joke directed towards another officer. All parties involved claimed their actions had no racial or retaliatory motive. (Internal Affairs Investigation of Doll's Head Incident by Captain Manescu).

On October 16, 1997, Chief Monahan scheduled a meeting between Phillips and Popovich to discuss the incident and the conclusions of the investigation. Chief Monahan rescheduled that meeting for the following day to accommodate Phillips' schedule. At 9:00 A.M. on October 17, Phillips came to the chief's office and told him he would not attend the meeting because there was no point to his attending. Monahan accepted this, and held the meeting with Popovich, Assistant Chief Mitchell, and Captain Manescu. During this meeting Chief Monahan counseled Popovich and reminded him to be sensitive and aware of the implications of his actions, even if his intentions were benign. (Mem. from Chief Gerald Monahan, Jr. to File, October 17, 1997). Later that afternoon, the chief held a second meeting, this time with plaintiff, Mitchell, Manescu, and several other members of the police force who were allegedly implicated in the incident. During the forty-five minute session the officers assured Phillips the incident was merely a practical joke intended for another officer and Monahan reminded everyone to remain sensitive to possible reactions to innocent pranks. Afterwards, Chief Monahan noted that the meeting ended on a "very positive note," and that the counseling "serve[d] as closure to the incident." (Mem. from Chief Gerald Monahan, Jr. to File, October 17, 1997).

Phillips, however, felt differently and filed a charge with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission on May 6, 1998. In a determination dated April 12, 1999, the EEOC found reason to believe that plaintiff had been subjected to a hostile environment, but did not find evidence of retaliation. (EEOC Determination, April 12, 1999). Eventually, in August 2000, the EEOC issued a right to sue letter and plaintiff filed this action in federal court.

Prior to this determination, but after having filed his complaint, a citizen filed a complaint leading to another internal affairs investigation of Phillips. On January 22, 2000, James Francis phoned the Allentown Police Department to complain that plaintiff had treated him in an inappropriate manner during a series of telephone calls and messages. (Report of Lt. Frank Peters, January 22, 2000). Francis followed up his original complaint with a letter written to Mayor Heydt. In his letter, Francis claimed that Phillips made harassing phone calls to him, used profanity, and behaved inappropriately and aggressively while trying to get Francis to answer his phone or come to the door. (Letter from James Francis to Mayor William Heydt, January 22, 2000). The mayor's office turned a copy of the letter over to the police department, and current Chief Carl Held assigned Captain Roger MacLean to conduct an investigation. (Dep. of Held, 10).

Once again, the investigation fully exonerated Phillips of any wrongdoing. The inquiry revealed that Francis, the complaining citizen, mistakenly believed Phillips had made threatening phone calls and used profanity with him, when in fact, it had been a bail bondsmen. Though Phillips participated in the Francis matter and spoke to Francis on the phone, the investigation concluded that someone else had made the offensive calls. The report noted that "more questions should have been asked instead of taking the bailbond people at their word," but no further action against Phillips was warranted. (Mem. from Captain Roger MacLean to Chief

Carl Held, February 18, 2000). Phillips, however, was again dissatisfied and on March 3, 2000, requested that Chief Held provide him with a copy of the investigation file from this case and any other during which he was subjected to review in the prior six years. In this request he indicated that former Chief Monahan had provided him with a copy of the Vargas complaint file. (Letter from Tony Phillips to Chief Carl Held, March 3, 2000). Held denied this request, and cited the Allentown Police Department General Order 304, from October 1, 1988, requiring that all investigations remain confidential to insure the full cooperation of witnesses. (Letter from Chief Carl Held to Tony Phillips, March 13, 2000).

In addition to the incidents in which he was personally involved, Phillips chronicles the mistreatment of other minority officers on the Allentown police force. Phillips contrasts the treatment of two officers, one black and one white, after each missed several court appearances. In 1988, Patrolman Claude Rone, who is black, missed appearances after which the department conducted an internal affairs investigation. As a result of this investigation, Chief Wayne Stephens suspended Rone without pay for 10 days. (Dep. of Ronald Manescu, 236–39). Eleven years later, Steve Mould, who is white, missed a number of court appearances. Unlike the Rone case, the department did not conduct an internal affairs investigation. Mould received counseling from his superiors and could not teach at the Police Academy or attend a particular training class. (Decl. of Stephen Mould at ¶¶ 4–8, October 19, 2001). After Mould received a high score on the promotion exam Chief Held promoted him to Sergeant in February 2000. At the time of that promotion, Held did not know that Mould had missed court appearances in the previous year. (Decl. of Carl Held at ¶ 4, October 16, 2001).

In 1992, the department sent Officer Steve Hatfield, a member of the vice squad to receive Class B wiretap certification. In 1995, Hatfield, who is black, was transferred to the Neighborhood Community Police Division and in 2000 to the Traffic Division, and again to the Third Platoon. None of these divisions perform wiretapping functions. (Decl. of Michael Combs at ¶ 22, October 15, 2001). Phillips claims these transfers and the department's underutilization of Hatfield stemmed from a racially hostile environment. (Complaint at ¶¶ 93–95). However, no member of the Allentown Police Department currently does these taps because they rarely need them, and when the need arises the State Police, Lehigh County Drug Task Force, or the DEA does and pays for the wiretaps. (Decl. of Michael Combs at ¶ 22, October 15, 2001).

Phillips also takes exception to four internal affairs investigations of minority officers during 1995 and 1996. In March 1995, the department conducted an internal affairs investigation of Miguel Ortiz, a Hispanic officer, after he failed to turn over heroin he seized during an arrest and tested positive for cocaine. After admitting these offenses, among others, Ortiz resigned from the police force. (Internal Affairs Lead Sheet, Investigation Opened March 3, 1995; Letter to Chief John Stefanik from Miguel Ortiz, April 24, 1995), The following month, Lt. Combs conducted an internal affairs investigation of Sergeant Walter Felton, a black officer, after Felton's girlfriend filed criminal charges against him. When the court acquitted Felton of the criminal charges, the department closed the internal affairs file. (Mem. from Chief John Stefanik to File, June 21, 1995). Patrol Officer Ronald Spruill, who is black, was the subject of an internal affairs investigation beginning June 20, 1995. Eventually, Spruill waived

his right to a hearing and accepted a thirty day suspension without pay after he admitted to illegal gambling. (Dep. of Ronald Manescu, 158, 161–64). Officer Wendy Brantley, who is black, became the subject of an internal affairs investigation on February 22, 1996, after someone accused her of supplying drugs to a state trooper. After an investigation, Captain Scott Mitchell determined that the allegations against Brantley, who is black, were unfounded. (Internal Affairs Investigation of Brantley).

Despite these events, the defendants have not demoted or terminated Phillips. In May 1999, plaintiff received commendations for both heroism and achievement, signed by the chief of police and the mayor. (Dep. of Phillips, 94). In May 2000, he requested a transfer to the youth division and the department assigned him there in January 2001. (Dep. of Phillips, 224–25). In 1992, the defendants promoted Phillips to sergeant. (Dep. of Phillips, 24). Since that time, he took the required exam for promotion to lieutenant three times, in 1997, 1999, and 2001. (Dep. of Phillips, 39–40). Plaintiff did not score high enough on any of these exams to be eligible for promotion. He blames his poor test performance, at least in part, on the stress resulting from the hostile work environment. (Dep. of Phillips, 60, 72–74). At the time of filing this suit, on October 27, 2000, through present time, Phillips remains a sergeant in the Allentown Police Department. (Pl.'s Mot. for Partial Summ. J. at ¶ 2).

### LEGAL STANDARD

A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is enti-

tled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The trial court should determine whether there are issues with regard to material facts that warrant a trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, the court must consider the underlying facts in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that might be drawn from those same facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Sempier v. Johnson and Higgins*, 45 F.3d 724, 727 (3d Cir.1995) (en banc). It is appropriate to grant summary judgment if the court finds that the record "could not lead a rational trier of fact to find for the nonmoving party, [and] there is no 'genuine issue for trial.'" *Matsushita* 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

### DISCUSSION

*Defendants' Motion for Summary Judgment*

1. *Some of plaintiff's claims are time barred under Title VII, the PHRA, and Section 1981*

Under Title VII, a plaintiff must file with the EEOC or its state or local equivalent within 300 days of the alleged actions or practice that constitute illegal discrimination. *See Mroczek v. Bethlehem Steel Corp.*, 126 F.Supp.2d 379, 385–86 (E.D.Pa.2001). Pennsylvania law further restricts the time for filing, requiring that a plaintiff file with the PHRC within 180 days of the illegal conduct in order to recover under the PHRA. *Id.* at 386. Because the federal period is longer, if a claim is untimely under Title VII, it will also be considered untimely under the

PHRA.[5] Using the limitations period for personal injury under Pennsylvania law, federal courts apply a two year statute of limitations to a claim under Section 1981. See *Williams v. Home Depot, U.S.A., Inc.,* 1999 WL 788597, No. CIV. A. 98–CV–3712 at *3 (E.D.Pa. October 5, 1999).

Though these limitations periods generally apply, the Supreme Court has recognized that they cannot be applied in all situations. Where a plaintiff has difficulty identifying precisely when the illegal conduct occurred or a violation is continuous and ongoing, the filing requirement is "a requirement that, like a statute of limitation, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). The continuing violation theory is one of these equitable exceptions and permits a plaintiff to "pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 754 (3d Cir.1995). In order to successfully present a continuing violation claim, the plaintiff must demonstrate that: (1) at least one discriminatory act occurred within the actual filing period and (2) the discrimination was not comprised of "isolated, intermittent acts of discrimination," but instead of a "persistent, on-going pattern." *Id.* at 754–55. Once a plaintiff has demonstrated a continuing violation, plaintiff may recover for the entire violation and offer evidence of all events that compose the violation. *See id.* at 755. If the plaintiff does not establish a continuing violation, he or she may recover only for the conduct within the applicable statutory period.[6]

The Third Circuit has enumerated several factors relevant to determining whether or not a continuing violation exists. These include the subject matter of the various incidents, the frequency at which they occur, and most importantly, their "degree of permanence." *Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 482 (3d Cir.1997). When the alleged actions of the defendants are of the type that should trigger "an employee's awareness of and duty to assert his or her rights," then there is less likelihood that a continuing violation has occurred. *Id. quoting Berry v. Board of Supervisors of Louisiana State Univ.,* 715 F.2d 971, 981 (5th Cir.1983). A hostile environment claim, however, enjoys a "natural affinity" with a continuing violation claim. The individual events that will trigger knowledge of a violation are insufficient to make out a hostile environment claim. Because such a claim depends on a sustained pattern of behavior, courts often find it necessary to look at evidence of incidents occurring both before and after the relevant filing periods. *West v. Philadelphia Elec. Company,* 45 F.3d 744, 755 (3d Cir.1995).

 In the instant case, Phillips filed a claim with the EEOC on May 6, 1998. Unless the continuing violation theory or

---

5. Federal and state courts consider Title VII and the PHRA as embodying identical substantive standards. *See Latch v. Southeastern Pennsylvania Transp. Authority,* 984 F.Supp. 317, 319 (*citing Kelly v. Drexel University,* 94 F.3d 102, 105 (3d Cir.1996)); *Kryeski v. Schott Glass Technologies, Inc.,* 426 Pa.Super. 105, 626 A.2d 595 (1993). They are, however, subject to different limitations periods. Therefore, I will discuss them separately for purposes of statute of limitations analysis, but will consider them together in my substantive analysis.

6. The plaintiff may still present evidence of discriminatory acts outside of the filing period if admissible under the Federal Rules of Evidence. *See id.; Williams v. Home Depot, U.S.A., Inc.,* 1999 WL 788597, No. CIV. A. 98–CV–3712 at *3 (E.D.Pa. October 5, 1999).

another type of equitable tolling applies, any claim based on an incident of discrimination that occurred prior to July 7, 1997 is time-barred.[7] For purposes of the PHRA claim, plaintiff filed with the PHRC on May 6, 1998. Under the 180 day limitations period, all claims prior to December 8, 1997 are time-barred. Phillips filed this lawsuit in federal court on October 27, 2000. Under the two year statute of limitations applicable to his Section 1981 claim, all events prior to October 27, 1998 should be dismissed as untimely. Defendant contends that almost all of the incidents alleged in Phillips's complaint occurred outside of the statutory periods. Under their analysis of the Title VII claim, only the September 1997 doll's head incident and the citizen complaint investigation from 2000 are timely and on the PHRA and Section 1981 claims, only the 2000 citizen complaint is timely. Defendants argue that because plaintiff failed to plead a continuing violation, he is barred from subsequently raising it and even if he could, the evidence does not support the inference of a continuing violation. Phillips argues that his complaint has clearly set forth an ongoing and pervasive pattern of discrimination and that this court should apply the continuing violation theory to allow his claims to go forward.

Phillips' 1998 EEOC and PHRC charge does not explicitly assert a continuing violation and Phillips identified only a single date in that charge. In the box for indicating the date the discrimination took place at the earliest and latest, Phillips answered 9/14/97 for both, which is the date of the doll's head incident, and did not check the available box for "continuing action." In the body of his charge, however-

er, he expands the scope of his allegations and states that "[s]ince January 1997, I have been harassed ... in a way intimidating me as to my participation in several newspaper article in reference to discrimination charges brought against Cpt. Michael P. Combs." (EEOC Charge of Discrimination, May 6, 1998). The complaint filed with the court does not use the terminology "continuing violation," but carefully details the events uncovered in the Combs investigation, going back as far as the early 1980s, again expanding the time span of the alleged hostile environment. The defendant argues that Phillips' failure to specifically allege a continuing violation in the EEOC charge and complaint is fatal to his current claim of a continuing violation.

While one case in this district adopted the Second Circuit's rule that to "invoke the continuing violations theory in an employment discrimination case, the doctrine must be clearly pled in both the administrative filing and the complaint," *Williams,* 1999 WL 788597 at *6, other opinions indicate a willingness to look at the substance of the allegations, rather than specific language of the pleadings, to determine if a plaintiff has properly invoked the doctrine. *See Okokuro v. Commonwealth of Pennsylvania Department of Welfare,* 2001 WL 185547, No. CIV. A. 00–2044 at *4 n. 3 (E.D.Pa. February 26, 2001); *Clark v. Commonwealth of Pennsylvania,* 885 F.Supp. 694, 707 (E.D.Pa.1995). In this case, the administrative and federal court complaints provide the necessary information to constitute a continuing violation allegation. The complaint specifically includes a long history of discriminatory conduct and although plaintiff did not include

---

7. The effective dates for claims have been taken from the memorandum of the defendants and the plaintiff does not question these dates. While my own calculations differ by a day or so, in this case, it is not necessary to split hairs as the plaintiff does not allege any incidents took place between May and September 1997. Therefore, I have accepted these dates as calculated by the defendants and unchallenged by the plaintiff.

precise dates, the defendants would have been aware of the time frame of Combs' alleged acts. While the administrative complaint only specifically alleges discrimination and retaliation beginning in January 1997, plaintiff also mentions the Combs investigation and that he witnessed the events underlying this investigation. Phillips completed the EEOC charge form himself and may not have had the benefit of legal advice in doing so. Examining the pleadings in the light most favorable to the plaintiff, his allegations date back to the Combs incidents in the early 1980s. Therefore, Phillips is not barred from presenting a continuing violation argument for failure to specifically allege it in his administrative complaint and prior pleadings before this court. However, when examining the merits of this claim, I find that plaintiff has only satisfied the requirements of demonstrating a continuing violation since the commencement of the Combs investigation in November 1996.

■ To demonstrate a continuing violation, the plaintiff must show that: (1) at least one discriminatory act occurred within the statutory period and (2) the conduct was part of an ongoing pattern. *See West*, 45 F.3d at 754–55. The parties do not dispute that plaintiff has satisfied the first element of a continuing violation claim and that at least one incident took place within the filing period— the doll's head incident on September 14, 1997 and the 2000 internal affairs investigation of plaintiff. Defendants contend that plaintiff fails to satisfy the second requirement—that they subjected him to a continuing pattern of discrimination. Plaintiff challenges this and argues that over a period of almost twenty years, from the time he joined the police force in 1982 and continuing to the present time, the City of Allentown, condoned or participated in a series of acts, that over

that time constituted a continuing violation of plaintiff's rights and created a hostile work environment. To a certain extent, plaintiff has raised a reasonable inference that there was a trend or pattern of discrimination over the twenty year period. Nonetheless, plaintiff may not recover for the alleged actions of Captain Combs that took place prior to the internal affairs investigation instituted in November 1996. The incidents that took place prior to November 1996 satisfy two of the relevant factors articulated by the Third Circuit in *Rush*—they are of the same subject matter, racial discrimination, and took place with enough frequency that they might have constituted a continuing violation. *See Rush*, 113 F.3d at 482. However, the third *Rush* factor, the degree of permanence, undercuts Phillips' position. *See id.* Phillips admits that he was aware of most of the incidents prior to the time the newspaper article detailed the conduct, and clearly became aware of all of them after the article appeared. The severity and pervasiveness of these alleged actions were sufficient to put the plaintiff on notice that he worked in a hostile environment. Therefore, Phillips may not recover for these incidents that took place prior to the Combs internal affairs investigation.

Plaintiff has presented enough evidence to proceed on a continuing violation theory from the time the internal affairs investigation of Combs commenced in November 1996, through the present time. During that period, Phillips alleges that he was subject to retaliation for participating in the Combs investigation, was targeted for an internal affairs investigation because of his involvement in that investigation, and pressured by members of the department not to pursue criminal charges against someone who made a false complaint against him. In this same 18 month peri-

od, in between the Combs investigation and Phillips' EEOC complaint, plaintiff also claims an officer used a racial epithet during muster [8] and, importantly, contends that the City of Allentown and the Allentown Police Department belittled the accusations made in the Combs investigation and failed to properly discipline Combs—effectively whitewashing the events. In September 1997, Phillips found the blackened doll's head inside his patrol car and he viewed it, in the context of the previous year's events, as a racially motivated action.

The subject matter of each of these allegations is the same, all involve racial discrimination. With the exception of the racial epithet, each incident involves a similar and more subtle form of discrimination. Over the eighteen month period, at least five incidents took place and underlying each of these was the sense that the department had essentially covered up and condoned a series of very serious allegations of racial discrimination against a high ranking officer. Taken alone, the things that took place between November 1996 and September 1997 might have seemed unthreatening to Phillips. No single incident during this time supports a hostile environment claim. After Phillips found the doll's head in his car, what he perceived to be a direct and real threat at "ethnic intimidation," he acted upon his rights within the prescribed statutory period. From the time of the Combs investigation forward, plaintiff has shown what might be construed as a continuing pattern of racial discrimination. Therefore, to the extent Phillips proves the racially motivated significance of incidents and acts from November 16, 1996, the date Chief Monahan ordered the internal affairs investigation of Combs, through the present time, he may recover on his claims.[9]

2. *Phillips has presented sufficient evidence of discrimination to survive summary judgment.*

To establish a successful claim for hostile work environment discrimination based upon race under Title VII and the PHRA an employee must establish that: (1) he or she suffered intentional discrimination because of race; (2) the discrimination was "pervasive and regular;" (3) he or she was adversely affected by the discrimination; (4) the discrimination would adversely affect a reasonable person of the same race; and (5) that respondeat superior liability applies. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990). Rather than consider each piece of evidence individually, the court should consider in light of the " 'totality of the circumstances, the existence of a hostile or abusive environment.' " *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir.1996) *quoting Andrews*, 895 F.2d at 1482. Relevant factors include the frequency and severity of the conduct, if it is "physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

---

8. "Muster" describes a meeting that takes place at change of shift when reporting officers receive general instructions for the impending shift. (Dep. of Phillips at 138–40).

9. Incidents that occurred after Phillips filed his EEOC charge include the February 2000 internal affairs investigation of him, and his continued poor performance on promotion exams which he claims is caused by the hostile environment. Because the internal affairs investigation matches other incidents, it is part of the pattern of ongoing discrimination, as is his poor exam performance, attributable to the resulting environment.

Title VII does not prohibit all workplace misconduct and allegations of isolated incidents cannot constitute a hostile work environment. *See Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 482 (3d Cir. 1997). Discrimination will be considered pervasive and regular where " 'incidents of harassment' occur either in concert or with regularity." *Andrews,* 895 F.2d at 1484 *quoting Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (2d Cir.1987). Additionally, a plaintiff alleging a hostile environment must demonstrate both subjective and objective elements. The employee must perceive the environment as hostile and show that a reasonable person would also find it hostile and abusive. This, however, does not mean that a plaintiff must suffer serious psychological harm in order to prevail on his or her claim. *See Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. An abusive work environment might detract from job performance, result in an employee resigning his or her position, or prevent an employee from advancing in a career path, all without "seriously affect[ing] employees' psychological well-being." *Id.* at 22, 114 S.Ct. 367.

■ In this case, after examining the totality of the circumstances, I find that Phillips has presented sufficient evidence to raise a reasonable inference that the Allentown Police Department constituted a racially hostile work environment. In describing events that occurred from November 1996 forward, in the context of the prior fifteen years, plaintiff has presented a triable issue of fact as to whether or not he suffered intentional discrimination because of his race, and that the discrimination was pervasive and regular. Though the parties differ in their interpretation of events, plaintiff has successfully raised the inference that a serious problem of racial discrimination existed within the Allentown Police Department and that discrimi-

nation motivated individuals within the department to take certain actions against the plaintiff and other minority officers. Given the period covered by the allegations and the serious nature of many of the incidents, Phillips has also met his burden in raising the inference that he was adversely affected by these events and that a reasonable person in his position also would have been so affected. Finally, plaintiff has at least raised the inference of respondeat superior liability. His allegations implicate the decisions of high level employees, including the mayor and several chiefs of police. Defendants do not deny the involvement of these ranking officials, they simply assign a different and neutral meaning to their actions. Once again, however, plaintiff's allegations and evidence raise the inference that racial discrimination was widespread throughout the department and may have tainted the actions of the defendants. When considering the totality of the circumstances, Phillips has presented sufficient evidence to raise a reasonable inference that the defendants subjected him to a hostile work environment under Title VII and the PHRA and therefore I will deny the defendants' motion for summary judgment.

3. *Plaintiff has raised the inference that a policy or practice of racial discrimination existed*

■ To prevail on a Section 1981 claim, a plaintiff must show that the defendants "intentionally discriminated against [him or] her because of race in the making, performance, enforcement or termination of a contract" or for similar reasons, denied him or her the enjoyment of the benefits of that contract. *McBride v. Hospital of the University of Pennsylvania,* 2001 WL 1132404, No. CIV.A. 99–6051 at *3 (E.D.Pa. September 21, 2001). Unlike under Title VII, under Section 1981 a municipality cannot be held liable based on a

theory of respondeat superior. For municipal liability to attach, a plaintiff must demonstrate that the alleged discriminatory practice rose to the level of an "official policy or custom." *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 692–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 735–36, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (indicating that Congress had intended 42 U.S.C. § 1983 to be the enforcement provision for § 1981 and extending the *Monell* requirements to claims brought under that statute). Official policy arises when a " 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Andrews*, 895 F.2d at 1480 *quoting Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). A custom arises when "though not officially authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." *Id. quoting Monell*, 436 U.S. at 690, 98 S.Ct. 2018. An employee may also establish the existence of a custom by providing evidence of "knowledge and acquiescence." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir.1996).

■ · Failure to properly train can, in particular circumstances, provide grounds for municipal liability. *See Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). Where the failure to train "amounts to deliberate indifference" a plaintiff may use this failure to satisfy the policy or custom requirement for liability under *Monell. City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). If instituting a basic

safeguard or procedure would protect against obvious violations of constitutional rights, the failure to institute such a procedure gives rise to a question of fact as to whether the defendants showed deliberate indifference. *See Berg*, 219 F.3d at 276–77. Once the plaintiff has shown a custom or policy, he or she must then demonstrate that the custom or policy actually caused the injury. *Beck*, 89 F.3d at 972.

■ Defendants argue that plaintiff's Section 1981 claim cannot survive their motion for summary judgment because Phillips has failed to identify any policy or custom on the part of the City of Allentown that would support a finding of municipal liability. In response, plaintiff contends that a reasonable fact finder could determine that the city's failure to train its employees on the proper way to handle harassment and discrimination complaints constitutes a custom or policy. In support of his position, Phillips points to the deposition testimony of Mayor Heydt and Chief of Police Held. The defendants direct my attention to the same depositions to support their position. While it appears that the City of Allentown did have an existing policy on racial and sexual harassment and did offer some training to its employees, the extent and content of this training are unclear. Chief Held had no recollection of any training prior to 1995 and only remembered limited training on harassment and discrimination after that time. (Dep. of Held, 21–24). Though the city instituted new policies after the Combs investigation, plaintiff has raised a reasonable inference that these changes were meaningless, and effectively amounted to having no policy or training on harassment and discrimination.[10]

---

10. In the instant case, there is no dispute that the decisionmakers, namely, the mayor and chief of police, possessed the requisite author-

ity to institute an official policy or custom. *See Black v. Stephens*, 662 F.2d 181, 191 (3d Cir.1981) (holding that Allentown chief of po-

Moreover, while in his response to the defendants' motion, Phillips focuses on the failure to train as the basis for municipal liability, a more expansive view of the pleadings offers an alternative theory. The results of the Combs investigation could be perceived as evidence that the defendants had a policy or custom of tolerating racial discrimination. The mayor and chief of police, two high ranking city officials, publicly announced the findings of the investigation and applauded its outcome. Then Chief Monahan announced Combs' purportedly limited punishment while Mayor Heydt stood by his side at a press conference. Paired with the other incidents chronicled by the plaintiff, when taken in the light most favorable to him, a reasonable jury might conclude that there was a policy or custom of tolerance of racial discrimination within the city and police department. Therefore, based on the evidence in the record at this time, I cannot find as a matter of law that no reasonable finder of fact could determine that a policy or custom sufficient to establish municipal liability caused a deprivation of Phillips' contractual rights. Defendants' motion for summary judgment will be denied.

### 4. *Mayor Heydt is not entitled to immunity*

■ Public officials may raise the affirmative defense of qualified immunity as a shield from liability for their official actions unless those actions violate "clearly established statutory or constitutional rights of which a reasonable person would … have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). When analyzing a qualified immunity claim, a court must first identify the constitutional or statutory right at stake and then determine if that right was clearly established at the time the defendants violated those rights. *See Altieri v. Pennsylvania State Police,* 2000 WL 427272, No. Civ.A. 98–CV–5495 at *12 (E.D. Pa. April 19, 2000). In order to determine if a right is clearly established the court must ask if it would have been clear to a reasonable official that his or her conduct violated the law. *See DeBellis v. Kulp,* 166 F.Supp.2d 255 (E.D.Pa.2001).

■ In addition to qualified immunity, a state or municipal official may claim immunity pursuant to the Pennsylvania Political Subdivision Tort Claims Act ("Tort Claims Act"), 42 Pa.C.S. §§ 8541, *et seq.* That law provides immunity for state and municipal officials from liability for damages from injuries resulting from their acts, unless enumerated as one of the eight exceptions to immunity or where the court determines that the acts were a result of "willful misconduct." *See Renk v. City of Pittsburgh,* 537 Pa. 68, 641 A.2d 289, 293 (1994). Willful misconduct arises where the "actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." *Id. quoting Evans v. Philadelphia Transp. Co.,* 418 Pa. 567, 212 A.2d 440 (1965). Further, the Tort Claims Act only protects officials from state law claims and affords no protection from liability on federal claims. *See Davis v. Cheltenham Township Police Dep't,* 767 F.Supp. 104 (E.D.Pa.1991).

The PHRA also narrows the scope of immunity available under the Tort Claims Act. Though the PHRA is not mentioned as one of the eight exceptions within the act itself, the state's anti-discrimination legislation expressly provides for liability

lice possessed sufficient authority for purposes of municipal liability); *Katzenmoyer v. City of Reading, Pa.,* 158 F.Supp.2d 491, 500– 01 (E.D.Pa.2001) (finding that actions of the mayor created official policy or custom for purposes of *Monell* ).

against political subdivisions. *See* 43 Pa. C.S. § 954(b). Because the legislature of Pennsylvania passed the PHRA after the passage of the Tort Claims Act, the PHRA can only be read as negating the immunity available under the Tort Claims Act. *See Carter–Herman v. City of Philadelphia,* 1995 WL 764574, Civ. A. No. 95–4030 at *4 (E.D.Pa. December 21, 1995); *Verde v. City of Philadelphia,* 862 F.Supp. 1329, 1336 (E.D.Pa.1994).

Title VII does not impose individual liability on the agents or employees of the employer defendant. *See Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1077–78 (3d Cir.1996). While generally courts interpret the PHRA in accordance with Title VII, in particular circumstances the state statute may provide for individual liability. *See Dici v. Commonwealth of Pennsylvania,* 91 F.3d 542, 543 (3d Cir.1996); *Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren P.C.,* 20 F.Supp.2d 885, 887 (E.D.Pa.1998). In addition to forbidding discriminatory conduct by employers, §§ 955(d) and 955(e) of the PHRA make it illegal for any "person" to retaliate against an individual for attempting to enforce his or her rights under the statute or to aid and abet the discriminatory conduct. 43 Pa.C.S. §§ 955(d) and 955(e). Therefore, when a plaintiff can demonstrate that an individual defendant either retaliated against him or her or aided and abetted the discriminatory practices, that individual can be personally liable under the PHRA, even though the same defendant may not be found liable under Title VII. Just as no immunity exists for municipalities under the PHRA, an employee defendant, named in his or her individual capacity cannot claim the protections of the Tort Claims Act. A plaintiff, however, must provide sufficient evidence to support a claim that the indi-

vidual defendant either retaliated against the plaintiff or aided and abetted the discriminatory conduct. *See Dici,* 91 F.3d at 543.

In the instant case, Phillips has named Mayor Heydt as a defendant in both his official and individual capacities. The defendants seek the dismissal of the mayor from this suit on the basis of qualified immunity and the immunity afforded to him under the Tort Claims Act. Plaintiff opposes this on the grounds that the mayor does not meet the legal requirements to claim immunity. Because the defendants have not indicated on what counts and what grounds they have moved for immunity, I will analyze each claim in turn.

██ Count I of Phillips' complaint alleges a violation of Title VII. As a baseline matter, plaintiff may not maintain a suit against Mayor Heydt in his individual capacity under this statute and may only hold him liable in his official capacity. *See Sheridan,* 100 F.3d at 1077–78. Presumably, the defendants' argument that Mayor Heydt is entitled to qualified immunity applies to the remaining claim, against Mayor Heydt in his official capacity under Title VII. Because Phillips' claim articulates a well-established federal right, and he has, for summary judgment, presented sufficient evidence to support that claim, Mayor Heydt cannot claim the protections of qualified immunity. Phillips claims that the mayor violated his rights, as guaranteed by the Civil Rights Act of 1964, commonly referred to as Title VII, by creating a hostile work environment. On the motion for summary judgment, plaintiff has presented sufficient evidence to support a finding that this violation occurred and that Mayor Heydt participated in that violation.[11] If, the fact finder determines that

11. In particular, Mayor Heydt's involvement in and support of the Combs investigation and

at the time of his alleged conduct, the mayor knew or should have known the actions he undertook violated Phillips' rights, he cannot claim immunity.[12] Therefore, on summary judgment Mayor Heydt cannot use qualified immunity to shield himself from Phillips' Title VII claim.

The defendants also argue that Heydt is entitled to the immunity protections of the Pennsylvania Political Subdivision Tort Claims Act with regard to Count II of plaintiff's complaint. This assertion is erroneous. The PHRA specifically provides for municipal liability. *See Verde*, 862 F.Supp. at 1336. The law extends liability to individuals where that individual has either retaliated against or aided and abetted the discrimination. *See Davis*, 20 F.Supp.2d at 887. If Phillips can show that Mayor Heydt either retaliated against him for enforcing his rights or aided and abetted the creation of a hostile work environment, the mayor can be found liable in his individual, as well as his official, capacity. For many of the reasons already articulated, I find that Phillips has presented sufficient evidence so that a reasonable finder of fact could determine that Mayor Heydt aided and abetted in the creation of a hostile work environment within the Allentown Police Department.[13] Heydt cannot claim immunity in either his personal or official capacities with regards to plaintiff's claim under the PHRA.

Unlike Title VII, under Section 1981 Mayor Heydt can be held individually liable for violating the plaintiff's rights. *See Cardenas v. Massey*, 269 F.3d 251, 268 (3d Cir.2001). Otherwise, the identical analysis applies to the defendants claim of qualified immunity on Count III that applies to the claim of immunity as to Title VII. Phillips has asserted his rights pursuant to a long standing and well-established federal law, barring interference with contracts and their benefits on the basis of race. Again, plaintiff has satisfied his burden on summary judgment and raised the inference that Mayor Heydt violated his rights secured by the Section 1981. Therefore, he will remain a party to this lawsuit in both his individual and official capacity with regard to the Section 1981 claim.

*Plaintiff's Motion for Partial Summary Judgment*

In a hostile environment claim, an employer may raise the affirmative defenses described by the Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Where the employer has not taken any tangible employment action

its results and the institution of the 2000 internal affairs investigation are relevant to and provide support for the plaintiffs hostile environment claim.

12. At this stage, plaintiff has simply presented enough evidence to raise the reasonable inference that Mayor Heydt participated in the events alleged in the complaint and that he had illicit motivations for doing so. At trial, plaintiff will need to actually prove these things by a preponderance of evidence before the finder of fact can hold the mayor liable.

13. In particular, plaintiff has presented evidence that Mayor Heydt took an active role in the management of the Combs investigation and publicizing its results and passed along a citizen complaint resulting in an internal affairs investigation of the plaintiff. If plaintiff proves at trial, as he alleges in his complaint, that racial animus or retaliation motivated the mayor, then the jury could find Mayor Heydt individually liable under the PHRA for aiding or abetting the creation of a hostile environment or retaliating against Phillips for complaining about that environment.

against the plaintiff, the defendant can successfully raise the *Faragher–Ellerth* defense by demonstrating that the employer exercised reasonable care to quickly correct the illicit behavior and the employee unreasonably failed to utilize or take advantage of these corrective measures. *See Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. Federal Rule of Civil Procedure 8(c) mandates that an affirmative defense be included in the answer and failure to do so generally results in the waiver of that defense. *See Charpentier v. Godsil,* 937 F.2d 859, 863 (3d Cir.1991). However, where the defendant raises the defense at a " 'pragmatically sufficient time' " and the opposing party is " 'not prejudiced in its ability to respond,' " the employer has not waived the defense. *Id.* at 864 *quoting Lucas v. United States,* 807 F.2d 414, 418 (5th Cir.1986). Though ideally a party should raise the defense prior to a motion for summary judgment, a court may permit the party to do so, provided they can amend a previous pleading to include the defense. *See Kleinknecht v. Gettysburg College,* 989 F.2d 1360, 1374 (3d Cir.1993). Pursuant to Federal Rule of Civil Procedure 15(a), the court should permit the defendant to make the appropriate amendment and include the defense, unless the opposing party will suffer prejudice as a result of the change. *See* Fed.R.Civ.P. 15(a); *Kleinknecht,* 989 F.2d at 1374.

In the instant case, the plaintiff has moved for partial summary judgment to preclude the defendants from raising the *Faragher–Ellerth* defense, cited in their motion for summary judgment, because they did not include it in their answer. Defendants respond to this motion by arguing that while they did not use the precise words *Faragher–Ellerth* defense in

their answer, they did plead it by raising laches as an affirmative defense. In the alternative, defendants have made a cross-motion to amend the pleadings to include the defense. Because I find it appropriate to permit the defendants to amend their answer, I will deny the plaintiff's motion for partial summary judgment and grant the defendants' cross motion to amend.[14]

When considering whether to allow leave to amend, "prejudice to the non-moving party is the touchstone for denial of an amendment." *Cornell & Co. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978). If the plaintiff had notice of the defendants' intent to raise the affirmative defense, then he is less likely to be prejudiced by its inclusion. *See Singletary v. Pennsylvania Dep't of Corr.,* 266 F.3d 186, 194 n. 3 (3d Cir.2001). Phillips contends that because he lacked notice of the defense, he did not conduct the necessary and relevant discovery during the allotted period. Defendants counter that the plaintiff had notice of their intent to raise the *Faragher–Ellerth* defense during the discovery period. Both parties cite to the deposition testimony of numerous witnesses in support of their respective positions. While the defendants argue that plaintiff had notice of their intent to raise the defense no later than September 5, 2001, the date of Phillips' deposition, the plaintiff contends that nothing in the questioning supports that contention. Examination of the transcript, however, reveals that during the deposition, defendants' counsel had Phillips identify the city's harassment and discrimination policy and then asked him whether he had ever filed a complaint pursuant to that policy. (Dep. of Phillips, 97–102). This would appear to have provided some notice

---

14. Because I find it appropriate to permit the amendment, it is not necessary to determine if laches suffices to adequately plead the *Far-* *agher–Ellerth* defense in an answer nor must I examine the ways in which those two affirmative defenses differ.

of the intent to raise the *Faragher–Ellerth* defense, a theory further supported by plaintiff's own examination of defense witnesses. Plaintiff's counsel asked several members of the police department about the training they received concerning the handling of discrimination complaints and asked them to review their interactions with Phillips in light of the written harassment policy. (Dep. of Held, September 21, 2001 at 21–24, 30–31); (Dep. of Heydt, September 20, 2001 at 9–11).

This same evidence supports the position that the plaintiff would not be prejudiced by allowing the defendants to amend their answer to include the additional affirmative defense. Plaintiffs have already elicited testimony relevant to the topic, which upon examination, appears directed towards discrediting that defense. Plaintiff's own exhibits, submitted in opposition to defendants' summary judgment motion, include a copy of the City of Allentown Policy on Harassment/Discrimination.[15] To the extent plaintiff contends he will suffer prejudice without the opportunity to engage the services of expert witnesses on this topic and examine relevant records, I will, if requested, reopen discovery solely for this purpose. Plaintiff will have ample time prior to trial to address the *Faragher–Ellerth* defense as needed. Defendants will also have the opportunity to obtain a rebuttal expert if necessary or may challenge the admissibility of plaintiff's expert testimony through appropriate pretrial motions.

### ORDER

**AND NOW,** this day of April 2002, it is **ORDERED** that:

(1) Defendants' motion for summary judgment (docket entry # 9) is **DENIED;**

(2) Plaintiff's motion for partial summary judgment (docket entry # 7) is **DENIED;**

(3) Defendants' cross-motion for leave to amend the pleadings to include the *Faragher–Ellerth* affirmative defense (docket entry # 14) is **GRANTED;**

(4) Plaintiff may request to conduct discovery with regard to the *Faragher–Ellerth* issue. This request shall be made to the court no later than May 13, 2002.

---

15. Plaintiff also seeks to challenge the adequacy and applicability of the existing policy in their motion for partial summary judgment. However, that challenge should be directed towards the substance of the defense, rather than on a motion to prevent the defendants from raising it.